23-6559-cr(L)
*United States v. Sullivan, Bilda, Rankin*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

August Term, 2023

Argued: May 13, 2024     Decided: September 6, 2024

Docket Nos. 23-6559, 23-6608, 23-6609,
23-7875, 23-7882, 23-7887, 24-91

_____

UNITED STATES OF AMERICA

*Appellee,*

— v. —

JAMES SULLIVAN, JOHN BILDA, DREW RANKIN,

*Defendants-Appellants,*

EDWARD DEMUZZIO, EDWARD PRYOR,

*Defendants.*

_____

In Re: CONNECTICUT MUNICIPAL ELECTRIC ENERGY COOPERATIVE,

*Petitioner.*

_____

Before:

LYNCH, BIANCO, and KAHN, *Circuit Judges*.

_____

Drew Rankin, James Sullivan, and John Bilda ("Defendants") appeal from a judgment of conviction entered in the United States District Court for the District of Connecticut (Jeffrey A. Meyer, *J.*), following a trial at which the jury found Defendants guilty of one count of theft involving a program receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(A). That count charged that Defendants, officers and executives of the Connecticut Municipal Electric Energy Cooperative ("CMEEC"), misappropriated funds from CMEEC in 2015 to pay for four personal vacations under the guise that those trips were corporate "retreats."

Defendants raise four claims of error on appeal. First, Defendants challenge the sufficiency of the evidence to support the jury's finding that CMEEC received "benefits in excess of $10,000" in the charged one-year period, as required by the jurisdictional element of that offense. *See* 18 U.S.C. § 666(b). Second, Defendants claim that the government offered a frivolous theory as to which entity owned or had control of the stolen funds in order to charge Defendants with misappropriations of funds during the 2016 calendar year as part of other counts, one of which was voluntarily dismissed and the other of which Defendants were acquitted of, and that the inclusion of those counts caused Defendants spillover prejudice during their trial. Third, Defendants argue that the conviction should be vacated and the Indictment dismissed because the government purportedly misled the grand jury to believe that the trips were not approved by CMEEC's Board, despite the fact that three of the four trips were charged to a line item in CMEEC's annual budget. Fourth, Defendants argue that the district court erred in ordering restitution for the expenses arising from those three trips, and that those expenses should be excised from their restitution obligation.

In addition, CMEEC petitions for mandamus pursuant to the Crime Victims' Rights Act ("CVRA"), *see* 18 U.S.C. § 3771(a), seeking review of the district court's restitution order under the Mandatory Victims Restitution Act ("MVRA"). CMEEC contends that the district court erred in concluding that no portion of the legal fees that CMEEC advanced to Defendants and their acquitted

co-defendants for their defense in the instant prosecution was compensable as a "loss . . . of property" under the MVRA. 18 U.S.C. § 3663A(b)(1).

For the reasons set forth below, we reject each of these challenges. First, in 2015, CMEEC received $864,154.20 as the primary awardee of a federal grant program, and those funds are "benefits" within the meaning of 18 U.S.C. § 666(b). That provision does not require the entity to have retained or have been the ultimate recipient of the benefits, nor does it require a valuation of how much the disbursed fees "benefit[ted]" the entity. It is sufficient that the funds were provided as benefits and the entity received them. Second, the challenged government theory was not frivolous, nor did that theory cause any spillover prejudice. Third and fourth, we find no misconduct by the government before the grand jury or error by the district court in setting the restitution amount, as there was sufficient evidence at trial for a reasonable jury to conclude beyond a reasonable doubt that the trips were unauthorized notwithstanding that the budget contained a line item to which the trips were charged.

CMEEC's petition fares no better. On this record, we cannot conclude that the district court erred in finding that CMEEC's advancement of legal fees to Defendants lacked a sufficient causal relationship to their offense of conviction. Although we do not foreclose the possibility that a crime victim could recover advanced defense fees as part of a restitution award in an appropriate case, CMEEC is not entitled to them here.

We accordingly AFFIRM the District Court's judgment of conviction and its restitution order, and DENY CMEEC's petition for mandamus.

_____

TARA E. LEVENS (Conor M. Reardon, David E. Novick, *on the brief*), Assistant United States Attorneys, *for Vanessa Roberts Avery, United States Attorney for the District of Connecticut, New Haven, CT*.

DANIEL S. NOBLE, Krieger Lewin LLP, New York, NY (Matthew B. Danzer, Finn Dixon & Herling LLP, Stamford, CT; Craig A. Raabe, Christopher Barrett, Izard, Kindall & Raabe, LLP, West Hartford, CT; Thomas J. Murphy, James J. Healy, Cowdery, Murphy & Healy, LLC, Hartford, CT;

3

*on the brief*), *for Defendants-Appellants James Sullivan, Drew Rankin, and John Bilda*.

JOSEPH W. MARTINI (Leslie A. Cahill, *on the brief*), Spears Manning & Martini LLC, Southport, CT, *for Petitioner CMEEC*.

_____

GERARD E. LYNCH, *Circuit Judge*:

Drew Rankin, James Sullivan, and John Bilda ("Defendants") appeal from a judgment of conviction entered in the United States District Court for the District of Connecticut (Jeffrey A. Meyer, *J.*), following a trial at which the jury found Defendants guilty of one count of theft involving a program receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(A).[1] As charged in the Indictment, Defendants were officers and executives of the Connecticut Municipal Electric Energy Cooperative ("CMEEC") who in 2015 misappropriated funds from CMEEC to pay for four personal vacations – to the Kentucky Derby in 2015 and 2016 and to the Greenbrier Resort in August 2015 and October 2015 – under the guise that those trips were for corporate "retreats." In fact, the trips

---

[1] Under that statute, it is a federal offense for "an agent of an organization" that "receives, in any one year period, benefits in excess of $10,000 under a Federal program" to "embezzle[], steal[], obtain[] by fraud, or otherwise without authority knowingly convert[] . . . or intentionally misappl[y], property . . . valued at $5,000 or more" that "is owned by, or is under the care, custody, or control of such organization." 18 U.S.C. §§ 666(a)(1)(A), (b).

4

were primarily attended by guests with no business relationship to CMEEC, provided no legitimate benefit to CMEEC, and incurred lavish expenses wholly unrelated to CMEEC's business, and Defendants largely hid those facts from CMEEC's Board of Directors (the "Board") while disguising the expenses in nondescript line items in CMEEC's budget.

Defendants were indicted, along with Edward DeMuzzio and Edward Pryor (together with Defendants, the "Trial Defendants"),[2] in a four-count Indictment that charged each of them with one count of conspiracy to commit theft from a program receiving federal funds during 2014-2017, in violation of 18 U.S.C. § 371 and 18 U.S.C. § 666(a)(1)(A) (Count One), and three counts that each charged a violation of 18 U.S.C. § 666(a)(1)(A) for thefts during the calendar years 2014 (Count Two), 2015 (Count Three), and 2016 (Count Four). Def. App'x 35–54. The government voluntarily dismissed Count Four at trial, and the jury returned a mixed verdict on the remaining counts, acquitting Rankin, Sullivan, and Bilda on Counts One and Two while convicting them on Count Three. The district court then sentenced Rankin to twelve months' imprisonment, while Sullivan and Bilda were each sentenced to six months' imprisonment. The district court

---

[2] DeMuzzio and Pryor were acquitted on all counts submitted to the jury, and therefore are not parties to the present appeal.

also entered a restitution order, requiring Defendants to pay CMEEC $748,800.63, which, among other items, included the costs expended by CMEEC in 2015 for all four of the charged trips encompassed in Count Three. However, the district court declined to award CMEEC any of the $9,564,026.53 in attorneys' fees that it had advanced to the five Trial Defendants for their defense.

Defendants now appeal, raising four claims of error. First, Defendants contend that there was insufficient evidence to support the jury's finding that CMEEC had received "benefits in excess of $10,000" in the one-year period charged in Count Three, as required by the jurisdictional element of that offense. *See* 18 U.S.C. § 666(b). Second, Defendants claim that the government offered a frivolous theory as to which entity owned or had control of the stolen funds in order to charge Defendants with misappropriation of funds during the 2016 calendar year as part of Counts One and Four of the Indictment, leading to spillover prejudice on Count Three during their trial. Third, Defendants argue that the conviction should be vacated and the Indictment dismissed because the government purportedly misled the grand jury to believe that the trips were not approved by CMEEC's Board, despite the fact that three of the four trips were charged to a line item in CMEEC's annual budget. Fourth, on the same basis,

6

Defendants argue that the district court erred in ordering restitution for the expenses arising from those three trips, and that those expenses should be excised from their restitution obligation.

In addition, CMEEC has filed a petition for mandamus pursuant to the Crime Victims' Rights Act ("CVRA"), *see* 18 U.S.C. § 3771(a), seeking review of the district court's restitution order under the Mandatory Victims Restitution Act ("MVRA"). CMEEC contends that the district court erred in denying restitution for any portion of the $9,564,026.53 in legal fees that CMEEC advanced to the five Trial Defendants for their defense in the instant prosecution. Specifically, CMEEC asserts that those defense fees are a compensable "loss . . . of property" that resulted from Defendants' conduct underlying their convictions, 18 U.S.C. § 3663A(b)(1), and that the district court abused its discretion in concluding that those fees lacked a sufficient causal connection to Defendants' offense.

For the reasons set forth below, we reject each of those challenges. First, in 2015, CMEEC received $864,154.20 as the primary awardee of a federal grant program, and those funds are "benefits" within the meaning of 18 U.S.C. § 666(b). Although CMEEC quickly disbursed all but $9,363.08 to its subgrantees, § 666(b) does not require the entity to have retained or have been the ultimate

recipient of the benefits, nor does it require a valuation of how much the disbursed fees "benefit[ted]" the entity. It is sufficient that the funds were provided as benefits and the entity received them. Second, the challenged theory advanced by the government was not frivolous, nor did that theory cause any spillover prejudice. Finally, as to the third and fourth claims, we find no misconduct by the government before the grand jury or error by the district court in setting the restitution amount, as there was sufficient evidence at trial for a reasonable jury to conclude beyond a reasonable doubt that the budget allocation which contained the trips did not authorize Defendants' misappropriation of funds to pay for what were, in fact and by design, personal vacations.

CMEEC's petition fares no better. Although we reject Defendants' motion to dismiss the petition on the ground that CMEEC failed to properly assert its rights below, the petition fails on the merits. Based on the present record, we cannot conclude that the district court erred in finding that CMEEC's advancement of the fees lacked a sufficient causal relationship to Defendants' misappropriation of funds. Although we do not foreclose the possibility that a crime victim could recover advanced defense fees as part of a restitution award in an appropriate case, CMEEC is not entitled to them here.

8

We accordingly AFFIRM the District Court's judgment of conviction and its restitution order, and DENY CMEEC's petition for mandamus.

## BACKGROUND

### I.     CMEEC and Its Organization[3]

CMEEC is a publicly owned "municipal electric energy cooperative," Conn. Gen. Stat. § 7-233b(7), created under a Connecticut law designed "to permit municipal electric utilities in Connecticut to join together and form cooperative public corporations . . . for the purpose of furnishing efficient, low cost and reliable electric power in their areas of operation," *id*. § 7-233a.[4] CMEEC is wholly owned by its members. Although CMEEC's Bylaws defined CMEEC's members "as the Municipal Electric Utilities" (the "MEUs"), the Bylaws further provided that CMEEC's members were the municipalities that owned and operated the MEUs, "acting by and through their [MEUs] by authority of their Boards of Public Utility Commissioners." Def. App'x 1406. During the relevant period, the MEUs were: Groton Utilities; Jewett City Department of Public

---

[3] Because Defendants appeal their convictions following a jury trial, "we recite the facts from the trial evidence in the light most favorable to the prosecution." *United States v. Raniere*, 55 F.4th 354, 358 n.3 (2d Cir. 2022) (quotation marks omitted).

[4] CMEEC's primary function was to "buy blocks of electric power [from the open market] to furnish to municipal utilities," achieving better prices for those utilities due to economies of scale. *United States v. Rankin*, 651 F. Supp. 3d 523, 531 (D. Conn. 2023).

9

Utilities; Norwich Public Utilities; South Norwalk Electric and Water; the Third

Taxing District of the City of Norwalk; and Bozrah Light & Power Company,[5]

and the municipalities that operated those utilities were the City of Groton; the

Borough of Jewett City; the City of Norwich; the Second Taxing District of the

City of Norwalk; and the Third Taxing District of the City of Norwalk.

Pursuant to CMEEC's "Membership Agreement," which governed the

rights and obligations of CMEEC's members, CMEEC's expenses were "allocated

to the members according to their membership interest level." Gov. App'x 350.

Likewise, the Membership Agreement directed CMEEC to distribute the entirety

of its profits, which CMEEC's documents refer to as "Margin," Def. App'x 1372

(defining "Margin" as "all revenues less incurred expenses"), on a monthly basis

to the members in proportion to their respective ownership interests, *id*. 1382.

The Membership Agreement also required CMEEC to establish and

maintain "Rate Stabilization Fund[s]" ("RSFs") on behalf of each member "into

---

[5] We note that Bozrah Light & Power Company is a wholly owned subsidiary of Groton Utilities, as permitted by Connecticut law. *See* Conn. Gen. Stat. § 7-233b(8) (permitting a municipal utility, defined as a "body of a municipality," to serve the "inhabitants . . . thereof as well as others"). Although the record does not clarify the exact nature of the relationship between those entities and the towns of Groton and Bozrah, we need not decide whether Bozrah Light & Power Company was a body of Groton or of Bozrah, as that question is immaterial to the present appeal.

which such [m]ember may deposit and maintain resources," *id*. 1376, and which were designed to permit the members to offset month-to-month fluctuations in energy prices, *see id*. 1385; *see also* Gov. App'x 510 (describing RSFs as "money . . . used to make adjustments to future rates"). In addition to any member contributions, CMEEC was required to deposit "all CMEEC Margin allocable to any Margin-[e]ligible [m]ember into the [m]ember's Rate Stabilization Fund unless otherwise directed by the [m]ember." Def. App'x 1385. As demonstrated by the trial testimony and documentary evidence, the funds allocated to the RSFs were owned by CMEEC's members even though they were held and managed by CMEEC. *See* Gov. App'x 118 (describing RSF funds as holding member money "on deposit with CMEEC"); Def. App'x 1384 (describing RSFs as "[m]ember [f]unds" and providing that "CMEEC shall manage or cause to be managed all amounts held within the Rate Stabilization Funds . . . *in the same manner that it manages its own funds*") (emphasis added). Notwithstanding the language of the Membership Agreement, the RSFs were not segregated from the Margin or in distinct bank accounts, but rather were held in a *single* bank account that CMEEC maintained in its name along with other CMEEC monies. The funds allocated to

11

the RSFs were distinguished solely by the use of accounting entries and classifications in CMEEC's records.

CMEEC was managed by two distinct bodies, the "Member Delegation" and the "Board of Directors." Def. App'x 1405. The Member Delegation was comprised of one representative from each member and possessed the "primary responsibility for managing all matters related to membership, equity requirements, and the financial stability of CMEEC." *Id*. 1405. Meanwhile, the Board of Directors, which consisted of two representatives (and two alternates) from each of CMEEC's members, managed CMEEC's "operational affairs and business." *Id*. 1412. Among other duties, the Board was responsible for approving an annual budget "covering CMEEC's operating expenses and CMEEC's capital expenses for the following calendar year." *Id*. 1383. From 2010 to at least 2015, CMEEC was party to a power supply contract with Wallingford Electric Division ("Wallingford"), under which Wallingford, although not a member of CMEEC, was represented on CMEEC's Board. In turn, Wallingford was responsible for paying a share of CMEEC's "Administrative and General" ("A&G") expenses, but unlike CMEEC's members, was not eligible to receive Margin.

During the relevant period from January 2014 to December 2016, the Trial Defendants held the following officer, executive, or director positions at CMEEC:

- Drew Rankin was CMEEC's chief executive officer.
- James Sullivan was chairperson of CMEEC's Board and a CMEEC Board member representing Norwich until his resignation in late 2015.
- John Bilda was a CMEEC Board member representing Norwich.
- Edward DeMuzzio was CMEEC's Board secretary and a CMEEC Board member representing Groton.
- Edward Pryor was CMEEC's chief financial officer.

## II. Federal Program Funds

From 2010 to 2015, CMEEC received federal funds under the ConnSMART grant (the "Grant"), which was issued by the United States Department of Energy ("DOE") as part of the Smart Grid Investment Grant ("SGIG") program. The SGIG program was created pursuant to the American Recovery and Reinvestment Act, and was intended to develop the nation's electric grid system by promoting investments in "smart grid" technologies. To that end, CMEEC's Grant proposal sought federal funding to develop "smart grid functions" for both its own operations and those of its members, which would permit CMEEC to monitor electricity use and "shift load out of critical peak periods, thereby reducing power costs for customers." Def. App'x 996.

13

In 2010, the DOE accepted the grant proposal and awarded the ConnSMART grant to CMEEC as the "Primary Awardee," while its members participated under the grant as "Subawardees." *Id*. 859–60. The funds would be used by the municipal utility Subawardees to install "smart meters" to track customers' power usage, while CMEEC itself would use the data from the meters to inform its power purchases on behalf of its members. *See United States v. Rankin*, 651 F. Supp. 3d 523, 541 (D. Conn. 2023). Thus, the members' purchase of meters would allow CMEEC to compute "real time wholesale costs" in a "highly accurate manner" and at a "significantly reduced . . . short term forecast error rate," leading to cost savings for CMEEC itself. Def. App'x 1290–96.

As provided by the Grant agreement, the ConnSMART Grant used a reimbursement structure – meaning that the grantees would first incur costs and then be reimbursed by the DOE. Specifically, CMEEC and its members would incur qualifying expenses under the Grant agreement, whereupon CMEEC would consolidate and verify the documentation for all such expenses incurred by both itself and its members. Then, CMEEC would submit a reimbursement request to DOE, certifying that the information therein was correct. After approving the request, the DOE would transfer the reimbursement funds into

14

the "CONNSMART" bank account, which was owned by CMEEC and held at the Bank of America. CMEEC was then responsible for disbursing the funds to its member-subawardees for their respective shares of the reimbursements. In administrating the grant, the DOE interacted only with CMEEC as the lead grantee, and did not retain any control over the funds after they were disbursed to CMEEC nor send any funds to subawardees. *See* Gov. App'x 323, 342 (DOE representative, testifying that DOE "d[idn't] follow . . . money after it [was] provided to the lead recipient" and "d[idn't] send sums to subawardees or vendors.").

The final reimbursement request under the ConnSMART grant occurred in early 2015. On February 17, 2015, CMEEC requested reimbursement for $864,154.20. The request identified CMEEC as the "prime recipient" for the grant and was signed by CMEEC's Director of Finance and Accounting as the "certifying official." Def. App'x 1102–03. The reimbursement sought $9,363.08 for expenditures made by CMEEC itself and $854,791.12 for those made by its "subrecipient" members. *Id*. 1103. On March 31, 2015, the DOE approved the request and sent the full sum of $864,154.20 to CMEEC's CONNSMART bank account. On April 1, 2015, CMEEC then transmitted $854,791.12 from that

15

account to the subrecipient members, according to the expenses provided in its reimbursement request, and retained the remaining $9,363.08 for itself.

CMEEC did not receive any federal funds during the 2016 calendar year. However, at least two of the municipalities that operated member MEUs, the Cities of Groton and Norwich, received federal funds. Groton received $77,457.45 for snow removal from the Federal Emergency Management Agency, while Norwich received $778,804 in a Community Development Block Grant from the Department of Housing and Urban Development.

## III. Offense Conduct

In January 2011, CMEEC hired Rankin as its new CEO. Def. App'x 1344–67. For each year during his tenure as CEO, Rankin would prepare a budget for the following calendar year in coordination with the Board's Budget and Finance Committee (the "Budget Committee"), as provided under CMEEC's Bylaws. Once that committee "got all of its questions answered" by a member of management at a series of meetings and was satisfied with the proposed budget, the budget would be submitted to the full Board for a vote. *Id*. 233. The full Board reviewed the budget at "a higher level" and generally did not conduct a "line by line" review. *Id*. During each of those meetings, Rankin or Pryor would prepare a

16

set of budget materials to be presented to the board members attending that meeting.

In 2013, two years into his tenure, Rankin informally proposed a corporate trip to the 2013 Kentucky Derby to several CMEEC Board members during a meeting held at the Norwich Inn and Spa. After those members expressed their interest, Rankin purchased twenty-four tickets to the Derby and charged the costs to CMEEC's A&G expenses account, without a Board budget, vote, or resolution. As Rankin testified, "A&G" was an accounting entry that reflected "overhead" – the "cost to run the company that's not allocated to a specific project." *Id*. 520.

## A. Trip Planning and Budgets

In 2013–14, Rankin organized a second outing to the 2014 Kentucky Derby. *Id*. 532–33. During the budgeting process for the 2014 calendar year, Rankin inserted the trip expenses into the budget and "came up with the . . . dollar amount" to be spent on the trips, which would again be funded from CMEEC's A&G expense account. *Id*. 533. However, the budget did not contain the words "Kentucky," "Derby," or "retreat," or otherwise transparently account for the expenditures. Instead, the trip expenses were included within several line items,

17

primarily "Board Expenses" under the group heading "Misc._General_Exp." *Id*.

731 (2014 Budget Materials); Gov. App'x 1048 (Bilda, testifying that "the

Kentucky Derby" was "under board expenses" in the 2014 budget).

Although the budget was ultimately approved by a Board vote in late

2013, one of Wallingford's Board representatives, George Adair, objected to

increased A&G costs in CMEEC's 2014 budget as compared to the 2013 budget.

Those protests continued throughout 2013–14 and included an exchange of pre-

litigation letters between Wallingford and CMEEC. Although at that time no

Wallingford official knew about the Derby trips or that they were included in the

budget, Adair testified at trial that Wallingford's dispute with CMEEC centered

on its objection to paying for "expenses that were not for legitimate business

purposes," and that it would have been of "great concern" if Wallingford was

"shelling out money to pay for" such trips. Gov. App'x 319; *see also id*. 944

(Rankin, testifying that Wallingford did not know about the junkets and that its

CMEEC Board members were not invited).

CMEEC's budget process for the 2015 year began in 2014. At some point

prior to the Budget Committee's approval of a draft budget to be proposed to the

Board, Rankin devised a new accounting mechanism for the trips in response to

18

Wallingford's increasing scrutiny of the A&G costs. Instead of being accounted for as a "board expense" to the A&G account, the trips would instead be accounted under a "Contra Margin" account created specifically to pay for the trips and used solely for trip expenses. Gov. App'x 319, 355, 2591. The Contra Margin account was just that – rather than being an expense against revenue, from which Margin would be calculated, the expenses were "applied against" and paid from funds already designated as Margin – and was the only negative accounting and budget entry for Margin. *Id*. 2591–92, *cf*. Def. App'x 1372 (defining "Margin" as "all revenues less incurred expenses"). By creating the Contra Margin account, Rankin lowered the A&G expenses to which the trips had previously been charged and in turn, lowered the costs to Wallingford, which as a non-member was responsible for paying A&G expenses but ineligible to receive Margin distributions (and therefore unaffected by expenses paid from Margin).

Although the parties agreed at trial that the Contra Margin account was created in response to Wallingford's complaints about A&G expenses, they presented competing explanations for the purpose of that account's creation. Rankin testified that the Contra Margin account was designed to avoid charging

19

trip expenses to Wallingford because its Board members were not invited to the trips. In response, the government presented evidence that the account was designed to disguise the expenses from Wallingford and the Board. For example, Patricia Meek, CMEEC's Director of Finance and Accounting, testified that she could have simply "backed [the charges] out so that Wallingford wasn't responsible for those charges" while continuing to charge the trips as an A&G expense. Gov. App'x 355. On cross-examination, Rankin conceded that CMEEC could have continued to charge the trip expenses to A&G while issuing a credit to Wallingford for those costs, but that doing so would have caused the trips to appear in documents sent to Wallingford and might have alerted Wallingford about the trips.

In addition to creating a new accounting mechanism for the trips, Rankin altered the categorization of trip expenses within the budget. On October 8, 2014, Meek sent certain employees and Board members a presentation on the proposed A&G expense budget for 2015 ahead of a Budget Committee meeting. That presentation contained a slide titled "CMEEC A&G Budget Assumptions" that contained thirteen bullet points, one of which noted a "[c]hanged convention for funding member strategic retreat," Def. App'x 1541, consistent with Rankin's and

Pryor's plan to charge the 2015 Derby trip against CMEEC's Margin. Just as the accounting mechanism reduced the A&G expenses in CMEEC's accounting records by moving the trip expenses to a separate Margin account, the "changed convention" reduced the A&G expenses in CMEEC's budget. Among other line items in the presentation, the "Other Miscellaneous," Strategic Planning," and "Staff Travel, Lodging & Miscellaneous" categories respectively decreased by $200,000, $85,000, and $83,273 between the 2014 approved and 2015 proposed budgets. *Id.* 1545–47. Notably, the A&G expenses presentation did not contain a corresponding allocation for the 2015 trips, as they were no longer classified as an A&G expense.

Although a line item corresponding to the trip expenses ultimately appeared, references to those expenses in budget materials also grew increasingly vague. In an October 11, 2014 email to Pryor and Meek, Rankin suggested to Pryor that "we may want to reverse those expenses for [the 2014 Derby] from 2014 from A&G and deduct it from margin," Gov. App'x 2570, a retroactive change that would remove discrepancies between funding levels in the 2014 and 2015 A&G budgets caused by the reclassification of trip expenses. In that same email, Rankin directed Meek to "modify the slide set materials on

21

A&G for the note regarding the board strategic retreat. Use the phrase, member delegation expenses and retreats." *Id*.

On October 29, 2014, Meek sent Rankin the "CMEEC Proposed Budget" presentation for a Budget Committee meeting later that day. Def. App'x 1550. That presentation contained a "CMEEC A&G Budget Assumptions" slide identical to the one sent on October 9, 2014, except that Meek had followed Rankin's instruction to modify the note about the "changed [funding] convention" to refer to "Member Delegation Expenses and Retreats" rather than "member strategic retreat." *Id*. 1557. Once again, the trips were not contained within and did not appear as a line item in the "[c]omponent [c]osts" of CMEEC's A&G expenses budget. *Id*. 1570. Likewise, the trip expenses were not identified in the "Budget Book" prepared for the Budget Committee, which was a "very large Excel file" with over 1,200 entries that the committee could consult if they had questions "about particular areas of revenues or expenses." Gov. App'x 383–84, 393 (Meek, testifying that the Budget Book did not contain any references to "Kentucky," "Derby," "Greenbrier," the ticket broker, or the restaurant where participants dined). Instead, the trip expenses were tucked within a chart titled "CMEEC Margin," which contained a single line item for "Member Delegation

22

Expenses and Retreats" in the amount of $350,000, with no further detail. Def. App'x 1575.

However, even those vague references to trip expenses disappeared in the final 2015 budget as submitted to and approved by the full Board. Once again, the presentation included a "CMEEC A&G Budget Assumptions" slide, which contained identical language as the previous presentations in 12 of 13 bullet points – but this time the line regarding the "changed convention for funding" the trips had disappeared. *Compare* Def. App'x 1557 *with* Gov. App'x 2574. Nor did the presentation elsewhere reference that "changed convention." Likewise, the negative entry in the chart describing "CMEEC Margin" had changed from "Member Delegation Expenses and Retreats" to simply "Expenses." *Compare* Def. App'x 1575, *with* Gov. App'x 2583.

At trial, several government witnesses[6] testified that the trips, their costs and funding, and the creation of the Contra Margin accounting mechanism were never approved or voted on by the Board of Directors during the Board budget

---

[6]Those witnesses included Ellen Kachmar, Paul Yatcko, and Philip Sussler. Kachmar was Rankin's executive assistant, and was responsible for attending and taking minutes at Board meetings in 2014, 2015, and 2016. Paul Yatcko was a CMEEC board member from 2008-20, in his position as Director of Groton Utilities (2008–15) and CEO of South Norwalk Electric (2015–20). Philip Sussler was, during the relevant period, CMEEC's general counsel.

meeting or any other Board meeting. Indeed, those witnesses testified that the Board did not even discuss the trips, much less their costs. *See, e.g.*, Gov. App'x 128–30 (Yatcko, testifying that he did not know the details of the trips' costs or guest lists when he approved the budget). Nor were the trips, their funding, or their costs discussed with CMEEC's members.[7] Indeed, Rankin himself testified that the Board had never voted on the annual Derby trips or any other trip, and instead claimed that such a vote "wasn't required" and that the trips had been "approved" because they were budgeted. *Id*. 835. The government witnesses' testimony was supported by documentary evidence, as the 2014–16 Board minutes and votes did not contain any reference to the trips, their expenses, or their funding.

On January 19, 2015, after the budget had been approved, Pryor emailed one of CMEEC's accountants and directed her to create a new account "for some expenses to be applied against the member margin." Gov. App'x 2592. Although the accountant responded that she wanted to "vet this out" before adding accounts that "may be treated differently in the financial statements," Pryor

---

[7] For example, Yatcko testified that there were no Board discussions about going to the Derby in 2014 or about wanting to go again in 2015; no discussions in 2015 about the planned trip to the Derby that year; and no discussions about details of the trips such as the expenses, the unaffiliated guests, or the business value of those trips.

dismissed her reservations and responded "let's discuss." *Id*. 2591. The accountant would, a few days later, inform Kachmar that she had created, at Pryor's direction, "a new account needed for a Board Retreat purchase order that will be excluded from the Administrative dashboard." *Id*. 2594.

### B. 2015 Trip Expenses

During the 2015 calendar year, Defendants used CMEEC funds to pay for four lavish junkets on behalf of themselves, their family members, and acquaintances. Three of those excursions occurred during 2015: a trip to the Kentucky Derby in May 2015, a four-person trip to the Greenbrier Resort in August 2015, and a larger trip back to the Greenbrier in October 2015. The fourth trip occurred in 2016, when Defendants attended the 2016 Kentucky Derby, but was partially funded by prepayments for tickets and related expenses during the 2015 calendar year. All of the above trip expenses were charged to the Contra Margin account except for the August 2015 Greenbrier trip, which Defendants billed to CMEEC as an A&G expense.

#### 1. 2015 Kentucky Derby Trip

In June 2014, several months before CMEEC's 2015 budget was approved in November 2014, Rankin directed his assistant, Ellen Kachmar, to purchase 30

25

premium "Trophy Room" ticket packages to the 2015 Kentucky Derby. Def. App'x 1607–08. CMEEC paid for the tickets, at a total cost of more than $200,000, in a series of installments throughout the 2015 calendar year. All told, Defendants spent $294,031.61 of CMEEC's funds on the 2015 Derby trip, which in addition to the luxury ticket packages, included:

- More than $54,000 for a private jet to and from Kentucky. Gov. App'x 3155–65; *see also id*. 3145 (Rankin, writing to jet company that there was "[n]ot really a budget I am trying to hit, more of a number I can reconcile (if and when questioned :-))").
- $10,827.51 on a group dinner at a restaurant.
- More than $2,300 for limousine services to drive trip attendees to a house party hosted by a friend of Sullivan's.
- Separate flights for Rankin's date and for Bilda's and Sullivan's family members.
- Nearly $200 to UPS so that Rankin's date could separately ship her derby hat and glasses to Kentucky.

Rankin's invitation to the trip described it as a "strategic retreat" for Board members, Def. App'x 1610, but as the district court noted, "[t]here was no documentary evidence that the defendants did any work on this trip," *Rankin*, 651 F. Supp. 3d at 533. "For example, the agenda for the trip had entries like 'street festivals' and '[e]at, drink, be merry, and watch races all day'—but not any work meetings." *Id*., quoting Def. App'x 1612–13 (2015 Derby itinerary).

26

Moreover, although Rankin, Sullivan, Bilda, and DeMuzzio attended the Derby, "most of the guests had nothing or little to do with CMEEC's business activity," as the district court found. *Id*. Including Defendants themselves, only eleven of the thirty-two guests held any position with CMEEC. Def. App'x 1699. Sullivan invited his son, brother, and sister-in-law, as well as his bartender and the bartender's friend – none of whom had any business affiliation with CMEEC. Sullivan also gifted two seats on the private jet to personal acquaintances, who also had no connection to CMEEC. Bilda invited not only his wife but also his parents, Gov. App'x 1006 (Bilda, testifying that he invited his parents because it was a "bucket-list kind of trip" for them), none of whom had any business connection with CMEEC. Bilda also invited his friend and that friend's wife, purporting that the friend was a "key account customer" who could "spend some quality time learning more about public power, our joint action agency and wholesale energy costs." *Id*. 3190–92. Rankin also invited at least one personal "guest" with whom he shared a room at the Derby, *id*. 915, and personally authorized an expense reimbursement for her separate travel to and from the Kentucky Derby. Rankin's guest also had no business relationship with CMEEC.

27

The costs for the attendance of all of those non-business guests were paid for with CMEEC funds.

### 2. August 2015 Greenbrier Golf Trip

In August 2015, Rankin, Sullivan, Bilda, and DeMuzzio took a golf trip at CMEEC's expense to the Greenbrier Resort in West Virginia. Rankin first proposed the idea in a July 2015 email to Sullivan, Bilda, and DeMuzzio, which explained that he planned to hold a "board strategic retreat in October at The Greenbrier in West Virginia," and suggested to the group that they visit the Greenbrier in August "to check it out and to craft the agenda" for that subsequent trip. Def. App'x 1626. Although Rankin purported that he would "layout and share" his "10 year strategic plan [for] an enhanced operating system," his tentative agenda for the trip consisted only of "evaluation[s]" of "the hotel and [golf] [c]ourse[s]." *Id*. A week later, Rankin sent out another email confirming the four-day trip to the Greenbrier, and included an itinerary that consisted solely of rounds of golf at various courses and a tour of the bunkers beneath the hotel, without any work sessions. In response to the itinerary, Sullivan replied, "Is your name 'I deserve a raise?'" Gov. App'x 3237. A few days prior to the trip, Rankin again circulated an itinerary consisting solely of rounds

28

of golf and a tour of the bunkers, and added a dress code for the "recreational activities" and the "main complex dining and some bars." *Id*. 3261.

Ultimately, the four-man group spent over $21,000 on the trip, including over $11,000 for hotel accommodations and golf fees, over $3,000 for plane fares, and over $2,000 for two dinners, all of which was charged to CMEEC. As Defendants concede on appeal, the trip was not approved by the Board in the annual budget, Def. Br. at 81 n.17, and there was no evidence that the Board otherwise approved the trip or was even aware that the trip had occurred. Rankin's assistant – whose job included making travel plans for CMEEC executives and to classify for accounting purposes the charges made by Rankin to the company's credit card – was likewise unaware of the trip before it occurred. When Rankin submitted his credit card charges from the trip for her review, he claimed that the charges were expenses for the CMEEC Board's Compensation Committee, whose primary role was to determine Rankin's compensation and contract as CEO. Thus, unlike the other three trips taken that year, the August 2015 trip was charged to CMEEC's A&G account rather than the Contra Margin account.

However, the evidence at trial demonstrated that the trip was unrelated to the Compensation Committee, but was instead taken for the personal benefit of Defendants so that they could play golf. Neither Rankin nor Sullivan were members of the Compensation Committee, and Rankin did not invite two other members of that committee – Paul Yatcko and James Smith – to attend the trip. At trial, Yatcko testified that he was not aware of the trip when it occurred and that it was never discussed in a Compensation Committee or Board meeting. Nor was there any evidence that "compensation" was discussed at the trips or that any "compensation" ideas arose from the trips. Indeed, both Rankin and Bilda testified that compensation was not discussed during the trip, and Rankin testified that he charged the trip to the Compensation Committee because he thought of the idea of taking the trip during one of that Committee's meetings.

The government presented other evidence that the trip had no relationship to any legitimate CMEEC business purpose. Although Defendants purported that the trip was designed so that Rankin could discuss his new "enhanced operating system," there was no evidence other than Defendants' own uncorroborated testimony that they actually held such discussions. None of the emails or materials that Rankin sent in advance of the trip contained any details

30

regarding that system, and the documentary evidence and testimony contained no indication that any ideas or discussion arose from the trip. Indeed, Rankin testified that the system had already been implemented as early as March 2015, five months before the trip. As for Defendants' claim that they intended to "check [the Greenbrier] out" for a subsequent Board outing, Def. App'x 1626, the trial contained no documentary evidence of a discussion with the Board or post-trip report that assessed the merits of hosting a Board outing to the Greenbrier. Moreover, Rankin admitted that he had already visited the Greenbrier on another occasion prior to the trip.

### 3. October 2015 Greenbrier Trip

In October 2015, Rankin organized another, larger trip to the Greenbrier, which was attended by twenty-three guests, including Rankin, Bilda, Pryor, and DeMuzzio.[8] As with the 2015 Derby trip, Rankin advertised the October Greenbrier trip as a company "retreat," yet, in another similarity to the Derby Trip, "less than half [of the guests] were CMEEC employees or board members." *Rankin*, 651 F. Supp. 3d at 535; *see also* Def. App'x 1701. Although the itinerary for the October Greenbrier trip contained two three-hour "work session[s]," Gov.

---

[8] Sullivan did not attend, as he had left his employment with CMEEC prior to the October 2015 Greenbrier trip.

31

App'x 3316, the evidence demonstrated that only one work session was actually held, and that Rankin instead scheduled a ninety-minute tour of the Greenbrier bunker during the other of those sessions. Moreover, while Rankin testified that the purpose of the trip was to "educate [the Board] about the [entrepreneurial operating system] model" that he wanted to employ at CMEEC, *id*. 813, he also testified—as discussed *supra*—that that model had already been implemented as early as March 2015, seven months before the trip was taken. Moreover, none of the invitations, agendas, or other materials sent in advance of the trip referenced the model.

Meanwhile, the trip participants spent over $109,000 for the October Greenbrier trip, all of which was charged to CMEEC from the Contra Margin account. Those costs included roughly $42,000 to charter a private jet, $2,200 to purchase scarves from the Greenbrier's women's store as gifts, and $58,000 in hotel fees, dining, and recreation expenses at the Greenbrier, including over $10,000 spent at various golf courses. According to the testimony of two Board members, the trip was not voted on or even discussed by the Board, nor did it appear in any Board meeting minutes. Likewise, the documentary evidence suggested that Rankin first came up with the idea to hold a second trip to the

Greenbrier in July 2015, long after the 2015 budget was approved in the fall of 2014.

### 4. Prepayment for the 2016 Kentucky Derby Trip

One week after the 2015 Kentucky Derby Trip – months before CMEEC's 2016 budget had been drafted, let alone approved – Rankin authorized a $101,820 expenditure from CMEEC to prepay for forty tickets to the 2016 Derby, which was followed by two additional prepayments, at $93,320 each, for those tickets later in 2015. Those prepayments would later be smuggled into a non-descriptive line item in the 2016 budget. As in the 2015 budget, the trip expenses were not included in the breakdown of A&G expenses for the 2016 budget, but were instead a negative entry in the chart describing CMEEC Margin. And in another similarity to the 2015 Budget, the line item covering trip costs grew less detailed as the budget developed. Although that line item was titled "Delegation Related Expenses" in the presentation to the Budget Committee, Def. App'x 845, that line item in the presentation to the Board changed to simply read "Expenses," even though the "Delegation Related Expenses" – that is, the trips – were the only such "Expense[]," *id*. 1598.

Just like the 2015 Derby trip, the itinerary for the 2016 Derby trip contained no work meetings and was largely attended by guests with no business affiliation with CMEEC. Of the forty-four guests, only twelve (including Rankin, Bilda, DeMuzzio, and Pryor) were employees or board members of CMEEC, while thirty-two of the guests held no position with CMEEC and had no evident connection to CMEEC's business. For example, the guests included "the wife and mother-in-law of a board member who did not attend" the trip and a "CMEEC vendor's daughter and son-in-law who had no prior connection to CMEEC." *Rankin*, 651 F. Supp. 3d at 557 n.168. And in another similarity to the 2015 Derby trip, the 2016 trip involved the same kind of lavish expenses for a private jet, limousines, high-end hotel accommodations, group dinner, and premium Derby tickets.

## B.     Investigation

Just days after the 2016 Derby trip, Rankin committed CMEEC to purchasing another forty-ticket package to the 2017 Derby for nearly $300,000. However, in the summer and fall of 2016, local reporters began gathering information about CMEEC's lavish junkets. In response to press inquiries, Rankin provided lists of attendees to the 2015 Derby trip and the October 2015

34

Greenbrier trip, but each of those lists omitted the names of several attendees unaffiliated with CMEEC. Meanwhile, on October 23, 2016, the mayor of Groton requested that Rankin deliver, among other documents, all CMEEC Board minutes in which the "trips and the associated funds were discussed, approved, or reported." Gov. App'x 3493. In response, Rankin supplied some requested documents, but did not supply any Board minutes, asserting that "there was not ever a Board action or vote required for the retreats, therefore no minutes[] [exist] reflecting this type of event." *Id*. 3492.

Ultimately, news reports about the trips in late 2016 provoked a public outcry, leading CMEEC to cancel the planned trip to the 2017 Kentucky Derby. However, the tickets were not fully refundable, so CMEEC had to resell some of the tickets at a steep loss. Rankin himself purchased several of the tickets for his personal use.

## IV. Procedural History

In November 2018, a federal grand jury returned an indictment against Rankin, Sullivan, Bilda, DeMuzzio, and Pryor, charging all five of them with one count of conspiracy to commit theft from a program receiving federal funds from 2014 through 2017, in violation of 18 U.S.C. § 371 (Count One), and three counts

35

of theft from a program receiving federal funds, in violation of 18 U.S.C.

§ 666(a)(1)(A), for the calendar years 2014 (Count Two), 2015 (Count Three), and

2016 (Count Four). Counts Two and Three of the Indictment charged that

CMEEC had received more than $10,000 in federal benefits in 2014 and 2015,

respectively, and that Defendants had in each year wrongfully obtained property

"owned by [or] under the care, custody [or] control of CMEEC" as its agents.

Def. App'x 51–52. Meanwhile, Count Four charged that CMEEC's *members* had

received more than $10,000 in federal benefits in 2016, and that Defendants had

wrongfully obtained property "owned by [or] under the care, custody [or]

control of CMEEC" as agents of CMEEC's members. *Id*. 53. Count One, the

conspiracy count, mixed the latter three counts together, and charged that

Defendants had conspired to wrongfully obtain property from CMEEC as its

agents in the calendar years 2014 and 2015, and from CMEEC's members as their

agents in the calendar years 2014 to 2017.

As relevant here, the Indictment alleged that the Trial Defendants

organized trips at CMEEC's expense that were unrelated to its business and were

instead intended to personally benefit Defendants and their associates.

Defendants "did not seek the approval of the CMEEC Board of Directors for

36

these trips and did not include the costs for the trips as budget expenses in the annual general administrative budgets proposed to and approved by the CMEEC Board of Directors." *Id*. 41–42. Instead, Defendants directed the trips to be paid "from the CMEEC Margin account, in violation of the CMEEC Membership Agreement, without a vote of the CMEEC Board of Directors and without the written consent of the Member Towns." *Id*. 42.

The Trial Defendants moved to dismiss the Indictment as legally insufficient and due to purported government misconduct before the grand jury. Among other issues, the Trial Defendants argued that Counts One and Four of the Indictment should be dismissed to the extent that those counts alleged a misappropriation of property owned by or under the care, custody, or control of CMEEC's members, as the funds used to pay for the trips were paid for using funds that belonged to CMEEC. The Trial Defendants also argued that CMEEC's Board knew of and approved the trips, and that the use of CMEEC funds therefore did not violate § 666(a)(1)(A). Moreover, the Trial Defendants claimed that the Indictment falsely alleged that they had not sought board approval or included the trip costs in the budget to the Board, and that the government must therefore have knowingly presented false evidence as to those issues before the

grand jury. The district court denied the motion, concluding that those fact-based arguments as to whose property was taken and board authorization were improper invitations to review the sufficiency of the government's evidence prior to trial. *United States v. Rankin*, 422 F. Supp. 3d 564, 578–79, 585 (D. Conn. 2019).

Trial commenced in November 2021. The government presented the evidence described above, and attempted to prove that the CMEEC Board had not approved the trips and that the Trial Defendants had concealed the details of the trips from board members and employees who did not attend. *See Rankin*, 651 F. Supp. 3d at 536–37. Meanwhile, the Trial Defendants' "core defense throughout the trial" was that they held a good-faith belief that the trip costs were "legitimate business" expenses. *Id*. at 537.

Prior to the submission of the case to the jury, the government voluntarily dismissed Count Four, which alleged a violation of § 666(a)(1)(A), due to a pleading error in the Indictment not at issue here. *Id*. at 540.[9] Counts One, Two, and Three were submitted to the jury. In addition to seeking general verdicts on each of those counts, the verdict form contained special interrogatories that

---

[9] As the government acknowledged, Count Four mistakenly alleged that CMEEC's members had received federal funds but "that the theft was from CMEEC." Gov. App'x 916.

asked the jury to answer whether CMEEC had received more than $10,000 in federal benefits in 2014 and 2015, whether CMEEC owned or had care, custody, or control of the misappropriated property, and whether the cities of Groton or Norwich owned or had care, custody, or control of the misappropriated property.

The jury returned a mixed verdict, acquitting all five trial defendants on Counts One and Two. On Count Three, the jury returned a guilty verdict against Rankin, Bilda, and Sullivan, but acquitted DeMuzzio and Pryor. In the special interrogatories, the jury found that CMEEC had received more than $10,000 in federal benefits and that CMEEC owned or had care, custody, or control of the misappropriated property, but that the cities of Norwich and Groton did not have such a relationship to that property.

Defendants then filed Rule 29 motions for judgment of acquittal and Rule 33 motions for a new trial. Among other issues, Defendants argued that (1) there was insufficient evidence to permit a finding beyond a reasonable doubt that CMEEC received more than $10,000 in federal benefits, as required by § 666, (2) the Board authorized the trips by approving a budget that contained a line item encompassing the trips' costs, and therefore there was insufficient evidence to

prove their criminal intent, and (3) they were entitled to a new trial due to prejudicial spillover from Counts One and Four, which, with respect to Defendants' misappropriations in 2016 and 2017, were based on the government's assertedly frivolous theory that the misappropriated funds belonged to CMEEC's members and that those members included the towns.[10] Defendants also renewed their motions to dismiss the Indictment based on the government's alleged misleading of the grand jury as to the Board's approval of the trips and the ownership of the misappropriated property. The district court rejected all of Defendants' motions in a consolidated order. *See Rankin*, 651 F. Supp. 3d at 572.

At sentencing, the parties engaged in a lengthy dispute over the appropriate loss amount under U.S.S.G. § 2B1.1, which would determine the base Guidelines offense level. Defendants argued that the loss amount should exclude the expenses paid in 2015 for the 2015 Derby, October 2015 Greenbrier, and 2016 Derby trips, claiming that those junkets were not criminal misappropriations in violation of 18 U.S.C. § 666(a)(1)(A) because they served a legitimate business purpose and were budgeted and approved by the Board. The district court

---

[10] Defendants properly raised and preserved those arguments at trial. *See Rankin*, 651 F. Supp. 3d at 541 n.107.

disagreed, concluding that the lack of business-related activities and the inclusion of guests and expenses without any legitimate business connection to CMEEC demonstrated that those trips were disguised as "retreat[s]" in service of CMEEC when in fact they were intended as "purely personal corporate-financed vacation trip[s]." Def. App'x 1950. The court further concluded that the trip expenses were not approved by the Board, and that even if they were, CMEEC's officers and directors "d[id] not have a license to plunder corporate treasuries acting individually or collectively." *Id.*, quoting *United States v. Wallach*, 935 F.2d 445, 469 (1991).

However, the court did not find Defendants equally culpable. Given that Rankin organized all four trips charged in Count Three, the court found that the expenses for all of those trips were attributable to him, and accordingly set his Guidelines loss amount at $502,242.18. Meanwhile, Sullivan had left CMEEC's employ prior to the October 2015 Greenbrier trip and the prepayments for the 2016 Derby trip, and did not attend or plan those trips prior to leaving CMEEC. Accordingly, the court excluded those trips from Sullivan's Guidelines loss amount and set that figure at $104,765, the sum of the expenses paid in 2015 for the 2015 Derby trip and August 2015 Greenbrier trip. Finally, the court concluded

that there was insufficient evidence to show that Bilda knew of, or was involved in, the prepayments for the 2016 Derby, and therefore excluded those costs from his loss amount. However, the court concluded that Bilda was liable for the other three trips, leading to a total loss amount of $213,782.18. Ultimately, Rankin was sentenced to twelve months' imprisonment, and Sullivan and Bilda were each sentenced to six months' imprisonment.

After announcing Defendants' sentences, the district court received submissions regarding the proper amount of restitution under the MVRA. The government filed a memorandum seeking restitution on behalf of CMEEC, and CMEEC filed a supplemental memorandum of law and affidavits in support of both its own and the government's memoranda. As relevant here, CMEEC sought the expenses it had paid in 2015 for all four trips ($502,242.18) and the funds it had advanced to all five Trial Defendants for their defense against the government's prosecution ($9,564,026.53).

During the government's investigation but prior to the Indictment, the Trial Defendants had requested that CMEEC advance their defense fees, pursuant to the indemnification clause in its Bylaws. That clause provided that CMEEC's Board members and officers

shall be indemnified and held harmless by CMEEC against all costs and expenses, including reasonable attorneys fees and/or defense of suit, . . . in connection with the defense of any claim . . . or proceeding in which they may be involved . . . by reason of their being or having been [a CMEEC Board member or officer] . . . except in relation to matters as to which they shall be finally adjudged in such action . . . to be liable for . . . misconduct in the performance of duty.

Add. 219. CMEEC and the Trial Defendants then signed an "Affirmation and Undertaking," in which each Trial Defendant affirmed that he had "acted in good faith . . . and that [he] had a reasonable belief that [his] conduct was lawful," and promised to repay CMEEC the advanced fees "if it were ultimately determined in accordance with CMEEC's bylaws, resolution of the CMEEC board of directors, or applicable state law that [he] w[as] not entitled to indemnification." *Id*. 148. Pursuant to the Bylaws and those contracts, CMEEC then advanced Trial Defendants the following sums for their defense throughout the prosecution, trial, and sentencing proceedings of the present case: Rankin ($2,477,009.04), Bilda ($1,429,351.48), Sullivan ($1,477,237.03), Pryor ($3,227,541.78), and DeMuzzio ($902,887.20). CMEEC argued that all of those costs were losses to it caused by the convicted Defendants' criminally fraudulent conduct.

43

After receiving Defendants' papers in opposition, the district court entered a written opinion and order. *See United States v. Rankin*, No. 3:18-CR-272 (JAM), 2023 WL 7403638 (D. Conn. Nov. 9, 2023) ("*Rankin II*"). As for the trip expenses, the district court determined that the expenses qualified as a "loss" of property under 18 U.S.C. § 3663A(b)(1), and adopted the loss amounts it had calculated at sentencing, taking care to note that it had limited the Guidelines loss calculation to "actual loss." *Id*. at *3–4. Although Defendants again advanced their argument that the expenses for the 2015 Derby, October 2015 Greenbrier, and 2016 Derby trips were not a loss to CMEEC since its Board of Directors had approved and budgeted those expenses, the district court rejected that argument for the same reasons that it had done so in imposing its sentence. *Id*. at *4. Accordingly, the district court ordered restitution for the full amount of those expenses. *Id*.

By contrast, the district court declined to award restitution for the advanced defense fees. In the district court's view, those fees were not "necessary . . . other expenses incurred during participation in the investigation or prosecution of the offense," 18 U.S.C. § 3663A(b)(4), as the defense fees were not advanced "in response to government requests for assistance" or "in order to advance the investigation and prosecution of the offense of conviction," *Rankin II*,

44

2023 WL 7403638, at \*5 (quotation marks and emphasis omitted), citing *United States v. Afriyie*, 27 F.4th 161, 169, 173 (2d Cir. 2022). The district court also concluded that the advanced fees were not a "loss of property" resulting from the offense recoverable under § 3663A(b)(1), as they lacked a sufficient causal connection to the "conduct underlying [Defendants'] offense of conviction." *Id*. at \*7.

After awarding CMEEC restitution for certain other expenses not at issue here, the district court set the total restitution obligation for Defendants at $748,800.63. The district court then apportioned liability, requiring Rankin to pay fifty percent ($374,400.31), while Sullivan and Bilda were each held liable for twenty-five percent of the total ($187,200.16).

## DISCUSSION

Defendants raise four challenges to their convictions and restitution orders. First, in their sole challenge to the sufficiency of the evidence, Defendants claim that the government failed to prove that CMEEC received more than $10,000 in federal benefits, as required to prove that their theft from CMEEC violated 18 U.S.C. § 666(a)(1)(A). Although Defendants concede that CMEEC obtained over $850,000 in federal grant funds, they contend that the funds

45

CMEEC disbursed to its members are not "receive[d] . . . benefits" under

§ 666(b), and that the statute limits the benefits received by CMEEC to the

$9,363.08 that CMEEC retained for itself. Second, Defendants argue that their

convictions should be vacated because the government relied on a frivolous

theory to expand the temporal scope of the charged criminal conduct, which led

to spillover prejudice before the grand jury and at trial. Finally, Defendants raise

two challenges centered on their contention that CMEEC's Board authorized the

2015 Derby, October 2015 Greenbrier, and 2016 Derby trips by approving a

budget that contained a line item encompassing the expenses for those three

trips. First, Defendants claim that their convictions should be vacated because the

government purportedly misled the grand jury to falsely allege that Defendants

did not seek Board approval for the trips or include the trip costs in CMEEC's

budgets, when in fact the government possessed evidence that the trips were

encompassed within a budget line item. Second, Defendants claim that the

budget line item demonstrates that CMEEC's Board authorized the trips, and

therefore the district court erred in ordering them to pay restitution for those

trips' expenses.

In addition, CMEEC filed a petition for mandamus under the CVRA, seeking review of the district court's restitution order under the MVRA. CMEEC contends that the district court erred in denying restitution for any portion of the $9,564,026.53 in legal fees that CMEEC advanced to the five Trial Defendants for their defense against the charges. Specifically, CMEEC asserts that those defense fees are a compensable "loss . . . of property" that resulted from Defendants' conduct underlying their convictions. 18 U.S.C. § 3663A(b)(1).

We reject each of Defendants' and CMEEC's challenges, and find no error in the district court's thorough treatment of those questions.

## I.     Receipt of More Than $10,000 in Federal Benefits

As mentioned above, Defendants' offense of conviction contains a jurisdictional element that requires proof that the defendant misappropriated property belonging to "an organization" that "receive[d], in any one year period, benefits in excess of $10,000 under a Federal program involving a grant . . . or other form of Federal assistance." 18 U.S.C. § 666(b). On appeal, Defendants renew their argument, advanced before the jury and the district court, and rejected by both, that there was insufficient evidence to prove that CMEEC

47

received more than $10,000 in federal benefits during the 2015 calendar year, as required to sustain their convictions on Count Three.

The Parties agree on the basic facts and a related issue of law. The ConnSMART funds were "benefits . . . under a Federal program involving a grant," *id.*, as the DOE issued the grant as part of a larger federal initiative to modernize the nation's electric grid, created pursuant to statute, *see* 42 U.S.C. § 17381 *et seq.* As we have held, "there is a 'federal program' for the purposes of Section 666 whenever there is a specific statutory scheme that authorizes payments thereunder for the purposes of promoting or achieving the policy objectives of the United States." *United States v. Bahel*, 662 F.3d 610, 626 (2d Cir. 2011). On February 17, 2015, CMEEC submitted a reimbursement request for $864.154.20 to the DOE. As the "prime recipient" for the grant, CMEEC sought reimbursement for $9,363.08 in expenses incurred by itself and $854,791.12 incurred by its "subrecipient" members. Def. App'x 1103 (reimbursement request). On March 31, 2015, DOE approved the request and wired the full amount of $864,154.20 to the ConnSMART bank account, which was owned and operated by CMEEC. On April 1, 2015, CMEEC then disbursed $854,791.12 to its members, retaining $9,363.08 for itself.

Defendants argue that CMEEC, despite having received $864,154.20 of federal grant funds into a bank account under its custody and control, received less than $10,000 in federal benefits. First, they claim that the benefits "received" by CMEEC were limited to the $9,363.08 of DOE grant funds that CMEEC retained for itself, whereas the remaining $854,791.12 in grant funds that CMEEC received into its bank account and then disbursed to its members were not benefits received by CMEEC, since it did not retain those funds. Second, Defendants argue that, because the latter amounts of "DOE funds [were] received by the MEUs" and not by CMEEC, the government could not rely on proof that CMEEC "obtained a[] benefit" from the MEUs' "third party" receipt of those funds, or alternatively, that the government failed to present sufficient proof that CMEEC obtained such benefits. Def. Br. at 31; Def. Rep. Br. at 6. In other words, Defendants contend that the government was required (and failed) to prove that "CMEEC *actually benefitted* from the DOE funds" disbursed to the members in a dollar value that exceeded $636.93 ($10,000.01 less the $9,363.08 that CMEEC retained). Def. Br. at 32.

Neither argument finds any support in the statute or precedent, and we reject both contentions.

**A.    Standard of Review – Do Defendants' Contentions Present a Question of Fact or of Law?**

We review a preserved challenge to the sufficiency of the evidence *de novo*. *United States v. Jimenez*, 96 F.4th 317, 324 (2d Cir. 2024). Nonetheless, a defendant bringing such a challenge "bears a heavy burden . . . as the standard of review is exceedingly deferential" to the jury's verdict. *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (quotation marks omitted). We "view the evidence in the light most favorable to the government," and "must affirm if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jimenez*, 96 F.4th at 324 (quotation marks omitted).

However, despite the parties' joint framing of the issue as one of factual sufficiency, our precedents lead us to question that framing and the application of its concomitant standard of review to the present appeal. Defendants do not contest that the federal government disbursed $864,154.20 in federal funds to CMEEC; rather, they argue that $854,791.12 of those federal funds do not constitute "benefits" to CMEEC because CMEEC, in turn, disbursed that sum to its member utilities. We have previously ruled that the "question of what constitutes a benefit [under § 666(b) is] a legal question for the court," as that question "is a matter of statutory interpretation" that should not be resolved by

50

the jury. *United States v. Insaidoo*, 765 F. App'x 522, 524 (2d Cir. 2019);[11] *see also*

*Bahel*, 662 F.3d at 626–29 (2d Cir. 2011) (examining as a legal matter whether the

United Nations Participation Act, 22 U.S.C. § 287e, established a benefit program

for the purpose of § 666(b)).[12] Critically, we review such questions of statutory

interpretation *de novo*. *See Jaen v. Sessions*, 899 F.3d 182, 185 (2d Cir. 2018).

We need not decide whether the district court erred in submitting the

question to the jury, as Defendants do not challenge that decision on appeal, and,

in any event, Defendants invited any such error by seeking (and receiving) jury

instructions and a special jury interrogatory on the issue. Def. App'x 1712

(Verdict Sheet, asking jury to find whether "CMEEC received in excess of $10,000

in federal benefits"); *Rankin*, 651 F. Supp. 3d at 542 (noting that the jury was

instructed that the payments' origination from a federal benefit program "is not

---

[11] Although *Insaidoo* was decided by summary order, and therefore is not binding, "denying summary orders precedential effect does not mean that the court considers itself free to rule differently in similar cases." *See United States v. Payne*, 591 F.3d 46, 58 (2d Cir. 2010) (internal quotation marks and brackets omitted). Moreover, at least three other circuits have determined that whether the funds received by an entity constitute "benefits" is a question of law. *United States v. Briston*, 192 F. App'x 84, 86 (3d Cir. 2006); *United States v. Dubón–Otero*, 292 F.3d 1, 9 (1st Cir. 2002); *United States v. Peery*, 977 F.2d 1230, 1233 n.2 (8th Cir. 1992). We agree with the reasoning of those courts, and of our own summary order.

[12] Indeed, the district court itself acknowledged that it arguably "erred by even instructing the jury to decide if any payments to CMEEC were 'benefits.'" *Rankin*, 651 F. Supp. 3d at 544 n.131.

51

enough by itself to conclude that CMEEC received federal benefits," and that the jury "must consider whether the payments were a benefit to CMEEC as distinct from any benefit derived by other recipients of federal funds.") (quotation marks omitted). Those actions clearly demonstrate that Defendants "deliberately provoke[d] a procedural irregularity," and therefore "cannot complain of an error that [they themselves] invited." *United States v. Bastian*, 770 F.3d 212, 218 (2d Cir. 2014) (quotation marks omitted). Accordingly, even if Defendants had raised the issue on appeal, they could not seek to vacate their convictions or receive a new trial based on the court's submission of the question to the jury.

However, the invited error doctrine does not dictate what standard of review – the deferential *de novo* standard owed to the jury's verdict under a sufficiency challenge or the *de novo* standard applicable to questions of statutory interpretation – applies to Defendants' challenge on appeal. Nor can we necessarily conclude that Defendants have waived that question by arguing on appeal that their challenge should be reviewed under the deferential sufficiency standard, as several of our sister circuits have held that "'[a] party cannot waive, concede, or abandon the applicable standard of review.'" *United States v. United States Sugar Corp.*, 73 F.4th 197, 203 n.2 (3d Cir. 2023), quoting *United States v.*

52

*Escobar*, 866 F.3d 333, 339 n.13 (5th Cir. 2017); *see also Worth v. Tyer*, 276 F.3d 249, 262 n.4 (7th Cir. 2001) ("[T]he court, not the parties, must determine the standard of review, and therefore, it cannot be waived."). Fortunately, we need not decide whether Defendants are capable of waiving the proper standard or which standard should apply to the present appeal. Defendants' challenge fails even under the more favorable standard applicable to questions of law, and therefore necessarily fails to meet the deferential standard applicable to factual sufficiency questions.

B.      **An Entity "Receives . . . Benefits" even when It Acted Solely as a Conduit of those Benefits for Further Distribution, and Is Not Required to Retain, Administer, or Allocate the Benefits.**

As with any question of statutory interpretation, we begin with the text. *New York Legal Assistance Grp. v. Bd. of Immigr. Appeals*, 987 F.3d 207, 216 (2d Cir. 2021) ("Every exercise in statutory construction must begin with the words of the text.") (quotation marks omitted). Section 666(b) provides that the organization must have "receive[d], in any one year period, benefits in excess of $10,000." As the district court correctly concluded, all that § 666(b) requires is *receipt* of federal benefits; it does not require the organization to have *retained* those benefits. *Rankin*, 651 F. Supp. 3d at 546; *see also Insaidoo*, 765 F. App'x at 524 (Once it is established that the federal funds are benefits, "the government only ha[s] to

53

prove that [the entity] received more than $10,000 [of those] federal funds" to sustain a conviction.). An entity "receives" benefits when it takes or comes into possession of them, and a "receipt" of benefits is completed the moment that the entity takes possession. *Receive*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("[t]o take . . . ; to come into possession of or get from some outside source"); *Receipt*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("[t]he act of receiving something"). Accordingly, CMEEC received $864,154.20 of federal funds when the government transferred that sum into the ConnSMART bank account, notwithstanding that CMEEC's possession of $854,791.12 of that sum was only fleeting.

That plain-text understanding of § 666(b) is further supported by the statute's legislative history. In enacting § 666, Congress sought to "protect the integrity of the vast sums of money *distributed through* Federal programs from theft, fraud, and undue influence by bribery." S. Rep. No. 98-225, at 370 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3511 (emphasis added). Likewise, Congress cited three circuit cases as representing quintessential examples of entities that § 666 was intended to cover, *id*. at 370 nn. 2 & 3, all three of which involved organizations that "received federal program funds as the intended recipient"

54

but was "charged with the responsibility" for "spending the federal grant monies to benefit the intended beneficiaries," *United States v. LaHue*, 170 F.3d 1026, 1030 (10th Cir. 1999), abrogated on other grounds by *Fischer v. United States*, 529 U.S. 667, 671 (2000).

In line with Congress's clear directive, courts have uniformly rejected Defendants' position that an organization did not "receive" benefits merely because the benefits passed through its control on the way to the ultimate beneficiaries. It is well-settled that the identification of "one beneficiary of an assistance program . . . does not foreclose the existence of others" and that the reach of § 666 extends beyond the federal program's "targeted or primary beneficiaries." *Fischer*, 529 U.S. at 677–78. Accordingly, the Supreme Court held in *Fischer* that, even if qualifying patients are the "primary beneficiaries" of Medicare, the healthcare providers that obtain Medicare reimbursements for their treatment of those patients receive benefits within the meaning of § 666. *Id*. And, as especially relevant here, the Court thought it beyond question that "Medicare intermediar[ies] (such as Blue Cross and Blue Shield)," which obtain Medicare funds from the government and in turn disburse those funds to

55

treating hospitals, receive benefits under § 666 despite their obligation to transfer those funds. *Id*. at 678.

Moreover, we have already answered the present question in favor of the government. *See United States v. Zyskind*, 118 F.3d 113, 116 (2d Cir. 1997). In *Zyskind*, we were confronted with the theft of funds from a care facility housing disabled adults, nearly all of whom "received federal benefits from the Social Security Administration or the Department of Veterans Affairs." *Id*. at 114. Some of those benefits were made in the form of checks payable to the facility, which were then applied by the facility to the room and board costs of each resident or distributed to those residents as "personal allowance." *Id*. (quotation marks omitted). In a similar fashion to Defendants here, the *Zyskind* defendant argued that § 666(b) does not apply to entities that are "not direct beneficiaries of federal government benefits," *id*. at 115, and that receive federal funds merely as "custodian[s] for the individual beneficiaries," *id*. at 117. We decisively rejected that argument, concluding that the text and legislative history of § 666 made clear that the statute prohibits "diversions of federal funds not only by agents of organizations that are direct beneficiaries of federal benefits funds, but [also] by

56

agents of organizations to whom such funds are 'disbursed' for further 'distribut[ion]' to or for the benefit of the individual beneficiaries." *Id*. at 116.

Admittedly, the funds received by the facility and applied to the residents' room and board, which compensated the facility for its own costs, are unlike the funds transferred by CMEEC to the MEUs, which compensated the MEUs for their expenditures. But the same is not true of the facility's receipt of its residents' personal allowance, which is precisely analogous to CMEEC's receipt of grant funds on behalf of the MEUs. Both entities received the funds on behalf of, and were required to disburse them to, the ultimate beneficiaries. Critically, we did not differentiate in *Zyskind* between the funds that the facility applied to room and board and those that it disbursed to the residents; the government was free to rely on both sums, in combination, to prove that the facility had received "more than $10,000 in federal benefits." *Id*. at 117. The present case therefore falls squarely within *Zyskind*, and we accordingly conclude that CMEEC received $864,154.20 in benefits – the full amount of funds transferred to its bank account – notwithstanding that it acted as a conduit for further disbursement with respect to $854,791.12 of those benefits.

Defendants attempt to distinguish *Zyskind* on the basis that "CMEEC[,] unlike the organization in *Zyskind* . . . [,] did not . . . administer[] or otherwise have discretion to use the reimbursement funds" transferred to its members. Def. Rep. Br. at 5. In Defendants' view, the entity in *Zyskind* "administered" the benefits in that it "'applied the benefits payments it received towards the [facility's] cost of room and board,' with remaining money held by the facility and designated to each resident's 'personal allowance' funds." *Id*. at 9, quoting *Zyskind*, 118 F.3d at 114. However, *Zyskind* itself makes clear that the care facility did not have discretionary authority to determine how much money was to be distributed to the residents as allowance, nor did the facility have any authority to dictate how the residents would use those funds. In fact, the New York State Department of Social Services "designated" the amount of "'personal allowance' money to which each resident was entitled," and the facility was required to place those funds in "[a] separate account . . . for each beneficiary." *Zyskind*, 118 F.3d at 114, 116 (quotation marks omitted). To the extent that the facility had any role at all in administering those funds, it was limited to "maintain[ing] a record" of the allowance. *Id*. at 114. *Zyskind* therefore cannot be read to impose an "administration" or "discretionary authority" requirement.

More fundamentally, § 666(b) does not use the term "administer," "discretion," or any other analogous language; it only requires that the entity have "receive[d] . . . benefits." Indeed, Defendants' interpretation of the statute would lead to an absurdity – had Defendants stolen the entirety of the grant funds from CMEEC's ConnSMART bank account, their interpretation of § 666 would place that theft of federal funds beyond the scope of the statute simply because CMEEC was required to transfer the funds to their ultimate recipients. We decline to adopt such a reading at odds with Congress's "expansive, unambiguous intent to ensure the integrity of organizations participating in federal assistance programs." *Fischer*, 529 U.S. at 678. In enacting § 666, Congress surely intended to – and did – ensure that the ultimate recipients of federal benefits actually obtain those benefits, and that intermediaries which pass along federal benefits would be prevented from diverting those funds to their own use.

We therefore hold that, so long as the victim entity "receives" federal funds that are benefits in its hands, § 666(b), it is irrelevant whether or not the entity administered those funds or that the entity's custody over those funds was merely fleeting.[13] Accordingly, we reject Defendants' contention that the

---

[13] Regardless, even if § 666(b) required CMEEC to have "administered" the benefits to have "received" those benefits – a reading belied by the plain meaning of

jurisdictional amount for Count Three rested on proof that CMEEC "benefitted indirectly from federal benefits received by a third party (here, the MEUs)," Def. Rep. Br. at 6 (emphasis omitted), as CMEEC received $864,154.20 from the ConnSMART Grant in the first instance. CMEEC not only owned and operated the bank account into which the funds were disbursed, but the Grant Agreement described those funds sent to CMEEC for further disbursement as "funds . . . from the Grant Award *received by [CMEEC] from DOE*." Def. App'x 861 (emphasis added); *see also id*. 859 (Grant Agreement, providing that CMEEC "accept[ed] responsibility for receipt[] and disbursement of the Grant Award").

## C. Section 666 Requires Only that the Funds Received by the Organization are "[B]enefits" in Its Hands, and Does Not Require Proof that the Organization "Benefit[ted]" in Excess of $10,000 from those Funds.

---

those terms – CMEEC's role as the administrator and "primary awardee" of the Grant would undoubtedly satisfy any such requirement. Def. App'x 861 (DOE Grant Agreement). The ConnSMART grant obligated CMEEC to "act on behalf of all of the Parties as the Primary Awardee under the Grant Agreement"; to "be responsible for reporting to DOE on behalf of itself and each and all of the Subawardees"; to "be responsible for filing and [] make all filings with DOE for reimbursement of expenses and payment of the Grant Award" based on information provided by the Subawardees; and to "disburse funds received from the Grant Award received by it from DOE to the Subawardees as information and verification is provided by each of the Subawardees justifying the disbursement of funds." *Id*. 861–62. In short, to receive the Grant funds, CMEEC had to comply with the Grant's administrative requirements. We fail to understand how those acts are anything but "administration" of the benefits, nor do we think it relevant that such administration occurred prior to, rather than after, CMEEC's receipt of the benefits.

Defendants further argue that the $854,791.12 that CMEEC forwarded to its members cannot be counted toward the jurisdictional amount because there was insufficient proof that CMEEC indirectly benefitted from the federal benefits that the MEUs received. Def. Rep. Br. at 6.

However, Defendants again mischaracterize the present case and the statute. As we have just explained, an entity "receives benefits" at the moment that it obtains federal funds that are benefits, regardless of whether that entity is the "targeted or primary beneficiar[y]," *Fischer*, 529 U.S. at 678, or those funds are earmarked for further disbursement. Moreover, § 666(b) requires the entity to have "receive[d] . . . benefits in excess of $10,000"; it does not require the entity to have "benefit[ted] in excess of $10,000." Thus, where an entity received in excess of $10,000 in funds traceable to federal coffers, § 666(b) is satisfied if those funds qualify as "benefits" when obtained by the entity, regardless of how much those funds "benefitted" it.[14]

---

[14] We therefore need not decide whether CMEEC "receive[d] benefits" within the meaning of § 666(b) through proof that it benefitted from a third party's receipt of federal funds, as would be the case had the DOE directly sent the ConnSMART Grant funds to CMEEC's members without CMEEC's involvement, since CMEEC unequivocally received federal funds.

In any event, Defendants are incorrect in their blanket assertion that § 666(b)'s jurisdictional requirement cannot be met by such proof. *Fischer* itself makes clear that, in appropriate cases, an entity may "receive benefits" through a third party's receipt of

By way of illustration, the Supreme Court held in *Fischer* that "[t]he funds health care organizations receive for participating in the Medicare program," including reimbursements to those entities for treating qualifying patients, are "benefits" when received by those entities. 529 U.S. at 681. The payments themselves were the "benefits," and whether the entity had received in excess of the jurisdictional amount turned on whether those payments exceeded $10,000, not on whether the healthcare entities benefitted from those payments in excess of $10,000. *Fischer* did not, for example, direct courts to deduct from those Medicare reimbursements the providers' purchase prices for drugs that they administered to patients as part of their treatment. The providers' reimbursed expenditures in buying those drugs did not "benefit" those providers – they were ultimately sent to drug manufacturers or retailers, and the drugs themselves were taken by patients – but those reimbursements were nonetheless benefits received by the providers. *See also Zyskind*, 118 F.3d at 116 (drawing no

---

federal funds, as the Court thought it beyond question that "qualifying patients receive benefits under the Medicare program." 529 U.S. at 677. That was true regardless of the fact that patients do not receive *any* federal funds from Medicare reimbursements, which are disbursed to healthcare providers, and instead only receive treatment from the providers that is paid for by Medicare reimbursements. Thus, in at least some cases, an entity may receive benefits, without having itself received any federal funds, by receiving an item or service from a third party that is in turn paid by the government rather than by the receiving entity.

distinction between funds disbursed by entity to ultimate recipients as "allowance," from which the entity derived no benefit, and those retained by entity as payment for recipients' "room and board," in finding that entity received more than $10,000 in benefits).

Nor do we find compelling Defendants' implication that, where multiple entities are beneficiaries of a federal benefit, courts must allocate pro rata shares of that benefit to each entity. Just as the existence of "one beneficiary of an assistance program . . . does not foreclose the existence of others," *Fischer*, 529 U.S. at 677, the existence of one beneficiary of a federal dollar does not foreclose the existence of other beneficiaries of that same dollar. Notably, the *Fischer* Court, after establishing that Medicare payments provided to healthcare providers in exchange for patient care constitute benefits, did not require quantification or apportionment of how much of those payments were "benefits" to patients as opposed to the providers (by, for example, requiring deduction of the value of the treatment obtained by the patients from the sums paid to the providers). *Id*. at 681 ("The funds health care organizations receive for participating in the Medicare program constitute 'benefits.'").

Instead, *Fischer* instructs courts to examine the "structure, operation, and purpose" of the federal program to determine whether the entity's receipt of "federal funds disbursed under [that] . . . program" can "be characterized as a benefit," *id.*, an inquiry that primarily "turns on the attributes of the federal program," *United States v. Paixao*, 885 F.3d 1203, 1206 (9th Cir. 2018) ("*Fischer* teaches that § 666 embodies a distinction between transactions that occur 'in the usual course of business' and those that do not."). We think it obvious that ConnSMART Grant funds are "[f]ederal assistance within a specific statutory scheme intended to promote public policy objectives and not payments by the government as a commercial entity," *United States v. Rooney*, 986 F.2d 31, 35 (2d Cir. 1993), in that they fulfill "significant purposes beyond performance of an immediate transaction," *Fischer*, at 529 U.S. at 680.[15]

The Grant funds here were not made to reimburse the DOE for some good or service provided to it, and indeed, the DOE appears to have received nothing at all from CMEEC in return for the Grant funds. Instead, the government

---

[15] Consider, for example, the analogy of an organization or local government agency that supports local art galleries, and which applies for a grant from the National Endowment for the Arts and in its application details the galleries to which the entity intends to provide the funds. It is difficult to understand how it can be concluded that such an applicant does not receive "benefits" when its application is approved, even if it promptly disburses the money to the institutions listed in the application.

provided the Grant to improve the nation's electric grid system "in the interest of both the [funding recipient] and the greater community," and envisioned that CMEEC would "play a vital role and maintain a high level of responsibility in carrying out the program's purposes." *Id.* at 680–81. The Energy Independence and Security Act ("EISA"), under which the Grant was issued, was enacted with the policy objective "to support the modernization of the Nation's electricity transmission and distribution system," 42 U.S.C. § 17381, and CMEEC's "own operations" as an electric utility "are one of the reasons for maintaining the program," *Fischer*, 529 U.S. at 681.

Likewise, the Grant was "subject to several conditions designed in part to promote broader objectives . . . while ensuring that any money contributed . . . is responsibly expended and accounted for." *Bahel*, 662 F.3d at 627. For example, EISA defined the purchases which would and would not qualify for reimbursement grants, *see* 42 U.S.C. § 17386(b)–(d), and instructed the DOE to "require as a condition of receiving funding under this subsection that [grant] projects utilize open protocols and standards," *id*. § 17386(e)(1)(B), to "establish procedures to ensure that there is no duplication or multiple payment for the same investment or costs," *id*. § 17386(e)(1)(C), and to "establish procedures to

ensure there will be public records of grants made, recipients, and qualifying Smart Grid investments which have received grants," *id*. § 17386(e)(1)(D).

That the ConnSMART Grant funds were "benefits" is only made further evident by the Grant proposal, in which CMEEC described that the funds would be used to purchase equipment that would "enhance ongoing wholesale power purchasing and forecasting." Def. App'x 1050 (ConnSMART Project Execution Plan). Likewise, in the Grant Agreement, CMEEC covenanted that it "shall undertake the responsibilities under the Grant Agreement on its behalf and on behalf of the Subawardees and shall be responsible for reporting to DOE on behalf of itself and each and all of the Subawardees." *Id*. 861 (Grant Agreement). CMEEC also promised that it would "be responsible for filing . . . with DOE for reimbursement of expenses and payment of the Grant Award," and that it would oversee the "design, selection, installation and interoperability" of the equipment purchased by its members using Grant Funds, *id*. 861, 863. As those duties make clear, CMEEC was not a "mere passive recipient or disinterested conduit" for the benefit payments. *Rankin*, 651 F. Supp. 3d at 545.

**D.** **The Government Presented Sufficient Evidence to Prove that CMEEC Met the Jurisdictional Amount.**

The present case is quite simple, despite Defendants' overwrought attempts to complicate the issue. It is irrelevant whether or not CMEEC retained or administered the $854,791.12 in benefits that it disbursed to its members; CMEEC received them nonetheless as a participant in the Grant program. Nor we do need to place a dollar value on how much CMEEC "benefitted" from its receipt of grant funds – such as the value of the improvements to CMEEC's power monitoring that resulted from its members' purchase of equipment under the grant – because the Grant funds are themselves the "benefits" received.[16]

CMEEC received $864,154.20 in federal funds when DOE transferred that sum into CMEEC's bank account. All of those funds were "benefits . . . under a Federal program" when CMEEC received them as a participant in that program. 18 U.S.C. § 666(b). Thus, CMEEC received $864,154.20 in benefits. *See Fischer*, 529

---

[16] If we did need to do so, however, it would seem clear that the efficiency benefits and good will obtained by CMEEC from receiving and disbursing the funds to its members would surpass the paltry amount of $636.93 that, when added to the $9,363.08 retained by CMEEC itself, would bring the amount by which CMEEC "benefitted" over the jurisdictional threshold. *See*, *e.g.*, Def. App'x 1055 (Grant Project Execution Plan, in which CMEEC described that the smart meter technologies purchased under the Grant would permit it to "lower the cost of power through a) reduced peak capacity and peak transmission wholesale charges and b) improved bulk power purchasing, enabled by improved load forecasting").

U.S. at 677 ("Medicare payments are 'benefits'" received by healthcare providers.).

## II. Prosecutorial Misconduct

In their second challenge to their conviction, Defendants appeal the district court's denial of their Rule 33 motion for a new trial due to the government's purported misconduct in advancing a frivolous theory of prosecution, which we review for abuse of discretion. *United States v. Forbes*, 790 F.3d 403, 406 (2d Cir. 2015). Defendants also appeal the district court's denial of their motion to dismiss the indictment on the same basis, which we review *de novo*. *See United States v. Walters*, 910 F.3d 11, 22 (2d Cir. 2018) (motion to dismiss an indictment for "outrageous governmental conduct is a question of law" that is reviewed *de novo*) (quotation marks omitted).

As set forth above, CMEEC did not receive any federal funds, from a benefits program or otherwise, in the calendar year 2016. To assert a substantive § 666 violation based on acts that occurred in 2016, as charged in Count Four, and to expand the temporal scope of the conspiracy to violate § 666, charged in Count One, to encompass that calendar year, the government advanced a two-part "Member Towns" theory in the Indictment and at trial. First, the

government argued that CMEEC's members included not only the municipal electricity utility companies, but also the towns that owned and operated those companies. Second, the government argued that the funds diverted to pay for the trip expenses belonged to CMEEC's members, rather than CMEEC itself. In combination, these two arguments permitted the government to claim that the funds stolen by Defendants from CMEEC were in its "care, custody, or control" but nonetheless "owned" by the towns. 18 U.S.C. § 666(a)(1)(A)(ii). Since at least two of the towns had received more than $10,000 under various federal benefits programs in 2016, the government could thus charge a § 666 violation for that calendar year based on Defendants' diversion of CMEEC funds, notwithstanding that CMEEC itself had not received any federal funds during that year.

Defendants argue that the "Member Towns" theory was frivolous, and that the government's improper use of that theory to bring Count Four and expand the temporal scope of Count One, thereby expanding the scope of the Indictment to cover their misappropriation of funds that occurred in 2016, permitted it to introduce otherwise inadmissible evidence that created spillover prejudice affecting their conviction on Count Three, which charged solely misappropriations that occurred during the 2015 calendar year. We disagree on

69

both points – the government's theory was not frivolous, nor did the use of that theory have a prejudicial spillover effect.

## A. The Government's Position was Not Frivolous.

### 1. Legal Standard

To demonstrate that the government's theory in favor of prosecution was "frivolous," a defendant must show more than that the theory was invalid and was rejected by a court or jury. *See United States v. Bove*, 888 F.3d 606, 611 (2d Cir. 2018) (holding that arguable theory of prosecution ultimately rejected by district court was not frivolous, nor was prosecution frivolous because it relied on the testimony of a witness who was arguably not credible). The theory or claim must be "[m]anifestly insufficient or futile – in other words, obviously lacking a basis in law or fact." *Id. at* 608 (quotation marks and footnote omitted). As we have explained in the civil context, that inquiry is objective, and does not turn on the quality of the party's advocacy in advancing its theory. *Caisse Nationale de Credit Agricole-CNCA, New York Branch v. Valcorp, Inc.*, 28 F.3d 259, 264 (2d Cir. 1994) (Whether "[a]n argument constitutes a frivolous legal position for purposes of Rule 11 sanctions" is determined "under an 'objective standard of

70

reasonableness.'"), quoting *Derechin v. State University of New York*, 963 F.2d 513, 516 (2d Cir. 1992).

In making that determination, we review questions of law *de novo*, *see United States v. Al Kassar*, 660 F.3d 108, 124 (2d Cir. 2011), and questions of fact for clear error, *see Walters*, 910 F.3d at 22. "The question of who owns a given item of . . . property is a mixed question of law and fact," *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 111 (2d Cir. 2006), which we review *de novo*, *see Man Ferrostaal, Inc. v. M/V Akili*, 704 F.3d 77, 82 (2d Cir. 2012).

### 2. Membership

At trial, the government offered extensive evidence to demonstrate that the municipalities as well as the utility companies were members of CMEEC. For example, CMEEC's founding Membership Agreement described the municipalities as "Parties" to the Agreement, provided that "the Parties are the members of CMEEC," and was executed by the municipalities as "Members of CMEEC." Def. App'x at 1370, 1396.

In response to that evidence, Defendants contended that even if CMEEC, in practice, treated the towns as if they were its members, the towns could not have been members under Connecticut law. In support, they cite the provisions

71

authorizing the creation of Municipal Electric Energy Cooperatives ("MEECs") such as CMEEC, which define a "Member" of such cooperatives as "any municipal electric utility within the state . . . whose governing body authorizes membership in, and which becomes a member of, a municipal electric energy cooperative." Conn. Gen. Stat. § 7-233b(6). Because the statute does not define "Member" to include towns, Defendants claim that CMEEC's membership is clearly limited to electric utility companies and cannot lawfully include the municipalities that operate those utilities.

But Defendants' selective invocation of the statute is unavailing, and we need not consider too deeply whether the government had a non-frivolous basis to argue that CMEEC's members included the municipalities in addition to or instead of the utilities that they operated, because Connecticut law resolves a closely related point. CMEEC's authorizing statute, after defining the "Member[s]" of a MEEC, defines "[m]unicipal electric utility" as "an electric department, agency or other body of a municipality . . . [that] has been established in accordance with applicable provisions of law." *Id*. § 7-233b(8); *see also id*. §§ 7-213, 7-216 (permitting "municipalit[ies]" to operate and maintain

electric plants by appointing boards of commissioners). Thus, a "member" of a MEEC is a "body of a municipality."

As the Supreme Court of Connecticut has made clear, "it is axiomatic that municipal boards and agencies are extensions of the towns they serve, created for the purpose of performing those functions that towns are statutorily required or permitted to perform. . . . They are, in effect, alter egos of the towns." *Rettig v. Town of Woodbridge*, 304 Conn. 462, 482 (2012) (animal control board was alter ego of towns that jointly operated it). Although the Connecticut courts have not addressed whether municipal utility boards specifically fall under that rule, at a minimum, it is at least arguable that each of the utility companies that constituted CMEEC's members is simply an arm or alter ego of the town that operates it. *See* Conn. Gen. Stat. § 7-233b(8) (defining "Municipal electric utility" as "an electric department, agency or other body of a municipality," and not as a separate corporate entity).

In sum, CMEEC's members are the municipal utility companies, but those utility companies are "bod[ies] of a municipality," *id.*, and therefore are plausibly considered "alter egos of the" municipalities, *Rettig*, 304 Conn. at 482. We need not decide whether municipalities are, by and through their respective utility

73

companies, members of CMEEC. It is sufficient to resolve the issue before us to conclude that the government's position was plausibly supported and was not frivolous. We therefore cannot conclude that the government "misled" the grand jury by advancing the theory that the towns were members of CMEEC; indeed, that theory may well be correct as a matter of law.

### 3.    Ownership

We also reject Defendants' contention that the government advanced a frivolous theory in claiming that the funds stolen by Defendants were owned by CMEEC's members.

True, CMEEC is a corporate entity distinct from its member electric utilities, and possesses the power to "acquire, own, hire, use, operate and dispose of personal property" in its own right. Conn. Gen. Stat. § 7-233e(b)(10). Moreover, Connecticut adheres to the basic rule that a corporation's property belongs to the corporation and not to its shareholders. *See Success, Inc. v. Curcio*, 160 Conn. App. 153, 176 (Conn. App. Ct. 2015).

Nonetheless, while the government may not have had a sound basis to argue that CMEEC's members had a property interest in *all* of the funds owned by CMEEC or in its "care, custody, or control," 18 U.S.C. § 666(a)(1)(A)(ii), we

agree with the district court that the government had a colorable argument that the *specific* moneys diverted to pay for the trip expenses belonged to CMEEC's members. *See Rankin*, 651 F. Supp. 3d at 566–68.

CMEEC's Membership Agreement required CMEEC, on a monthly basis, to "allocate[] and/or disburse[]" the entirety of "CMEEC Margin," defined as "all revenues less incurred expenses received by CMEEC," to its eligible members into each of those members' "Rate Stabilization Fund." Def. App'x 1372, 1382. Thus, CMEEC's members were contractually entitled to receive their share of CMEEC's Margin – *i.e.*, profits – on a monthly basis. Although the Rate Stabilization Funds were maintained by CMEEC in its bank account, not segregated from its other funds, and tracked solely "by means of . . . classifications in its books and records," we agree with the district court that "[t]here is little doubt from the plain language of the Membership Agreement and the trial evidence that the monies allocated to the rate stabilization fund were indeed the property of and owned by CMEEC's members even though kept in the care and custody of CMEEC. *Rankin*, 651 F. Supp. 3d at 567; *see also* Def. App'x 1382–85 (Membership Agreement); Gov. App'x 511 (testimony of outside auditor that funds in the Rate Stabilization Funds were treated as liabilities to

CMEEC instead of assets and were "held by CMEEC, but CMEEC does not have rights to it. It's money belonging to the members.").

Meanwhile, Rankin and Pryor orchestrated a budget accounting mechanism by which payment for certain trip expenses in 2015, 2016, and 2017 were credited from the Contra Margin account rather than as an "administrative-and-general" expense. Thus, the trip expenses were allocated against and deducted from the Margin that CMEEC's Membership Agreement required it to distribute to the members, rather than categorized as expenses that reduced the available Margin in the first instance. Indeed, at trial the government presented contemporaneous CMEEC business records reflecting that trip expenses (referred to in the record as "board expenses") were not only deducted from the Margin allocation as a whole, but also that each of CMEEC's members were assigned a pro-rata share of the trip expenses to be deducted from their allocated Margin. Gov. App'x 2597–2623.

We agree with the district court that the government had a non-frivolous basis to argue that CMEEC's members owned a property interest in the moneys allocated to Margin prior to the disbursement of those moneys into the members' Rate Stabilization Funds. To begin, § 666 does not define the terms "owned" or

"property," nor have we or the Supreme Court defined the scope of those terms for purposes of that statute. Congress has, however, used similar terms throughout the Federal Criminal Code, and the cases interpreting those statutes provide a more than reasonable basis for the government's position that CMEEC's members owned a property interest in the Margin money.

It is well settled that "property," in the context of the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, includes both tangible and intangible property rights, *see, e.g.*, *Carpenter v. United States*, 484 U.S. 19, 25 (1987) (holding that the "intangible nature" of certain property rights or interests "does not make it any less 'property' protected by the mail and wire fraud statutes"). We have little doubt that that principle also extends to § 666(a)(1)(A). In *Kelly v. United States*, the Supreme Court not only treated the term "property" as indistinguishable between § 666(a)(1)(A) and § 1343, but also noted that "[a] government's right to its employees' time and labor" is a property interest that "can undergird a property fraud prosecution" under both statutes. 590 U.S. 391, 401 (2020); *see also United States v. Sanderson*, 966 F.2d 184, 188–89 (6th Cir. 1992) (concluding that § 666 "applies where both intangible and tangible property has been stolen").

Of course, not all intangible interests constitute "property," and the Supreme Court has repeatedly cautioned that such interests must be connected to a "traditionally recognized property interest." *Ciminelli v. United States*, 598 U.S. 306, 314 (2023). The members' interest in money designated as Margin was an enforceable right to payment created by contract, as the Membership Agreement guaranteed that the members would receive monthly distributions of the entirety of CMEEC Margin. Unlike the "right-to-control" property interest that the Court rejected in *Ciminelli*, such contractual rights to payment have long been recognized as valuable property, even if the payment has not yet occurred. *Krafick v. Krafick*, 234 Conn. 783, 795 (1995) (concluding that the right to payment of vested pension benefits is "contractual in nature," and that "contractual rights . . . are a 'type of intangible property,' and, as such, are encompassed in [the] definition of 'property'") (emphasis omitted), quoting 3 E. Farnsworth, Contracts (1991) § 11.1. Moreover, courts interpreting the mail and wire fraud statutes have repeatedly concluded that enforceable rights to payment are "property" that, when wrongfully thwarted by a defendant, may underlie a criminal prosecution. *See Pasquantino v. United States*, 544 U.S. 349, 355–56 (2005) ("Canada's right to uncollected excise taxes . . . is 'property' in its hands," because "[t]his right is an

entitlement to collect money from petitioners" and "[v]aluable entitlements like these are 'property' as that term ordinarily is employed."); *United States v. Ali*, 620 F.3d 1062, 1067–68 & n.3 (9th Cir. 2010) ("A right to payment is 'money or property' under 18 U.S.C. §§ 1341 and 1343.").

Once again, we need not decide whether the government's theory was legally correct, or whether that theory would have supported a valid conviction under Count One or Count Four of the Indictment. There was no such conviction, as Count Four was dismissed on the government's motion for other reasons, the jury acquitted Defendants on the broad-ranging conspiracy charged in Count One, and the jury's answers to the court's special interrogatories made clear that it based its guilty verdict on the theory – unchallenged by Defendants on appeal – that the theft was of money that belonged to CMEEC, and not to the member towns. In short, Defendants' attack on the theory underlying Counts One and Four is an attack on charges of which they were acquitted. Defendants' argument is thus a roundabout claim that the presentation of the unsuccessful theory was misconduct, because that theory was so frivolous that no reasonable lawyer could have adopted it. It is sufficient to reject Defendants' position to

79

conclude that the government's position was plausible, and we need not decide whether it was correct. We have no trouble concluding that it cleared that bar.

Accordingly, the government had a non-frivolous basis to argue that CMEEC's members had an ownership interest in the money designated as Margin, and that Defendants' theft of that money constituted theft of "property" that belonged to the members.

### 4. Conclusion

In sum, we agree with the district court's well-reasoned opinion that it was not "frivolous" for the government to claim that the funds used to pay for the trips belonged to the members and that those members were the municipalities. The jury's ultimate disagreement with the government's theory,[17] and acquittal on the count that relied on that theory, does not demonstrate that the government engaged in misconduct by advancing that theory. Defendants therefore are not entitled to a new trial or dismissal of the Indictment. *See United States v. Hamilton*, 334 F.3d 170, 183 (2d Cir. 2003) ("[N]o case has held that a defendant was entitled . . . to a new trial on the counts of conviction simply because the jury found the government's proof on other counts unpersuasive.").

---

[17] The jury received a special interrogatory that tasked it with determining the ownership of the Margin money, and it found that those funds were owned by CMEEC.

**B.  Even if the Spillover Analysis Is Applicable, Defendants Fail To Demonstrate Spillover.**

However, even if the government's theories had been frivolous, we would nevertheless affirm the district court's refusal to grant a new trial or dismiss the Indictment, as Defendants have not shown that they suffered prejudice from the presentation of those theories.

**1.  Indictment**

To obtain the dismissal of an indictment for prosecutorial misconduct before the grand jury, the defendant must show that he was prejudiced by such misconduct. *See Bank of Nova Scotia*, 487 U.S. 250, 263 (1988) (A court may not "dismiss the indictment on the basis of prosecutorial misconduct absent a finding that petitioners were prejudiced by such misconduct."). Defendants cannot make that showing here. Count Three, the sole count of conviction, was not premised on the "Member Towns" theory, and therefore any misconduct in advancing that theory could not have "substantially influenced the grand jury's decision to indict" on that count. *Id*. at 256 (quotation marks omitted).

Moreover, the question of CMEEC's membership and of the ownership of the stolen funds was exhaustively argued at trial, and the jury nevertheless convicted Defendants on Count Three. "It is well settled that a guilty verdict at

81

trial remedies any possible defects in the grand jury indictment." *United States v. Lombardozzi*, 491 F.3d 61, 80 (2d Cir. 2007) (quotation marks omitted). Thus "even if we were to find that the grand jury indictment was defective" because the government "knowingly or recklessly misled the grand jury" as to an "essential fact," we will not overturn a conviction where, as here, the evidence was "submitted to the petit jury which found [the defendant] guilty beyond a reasonable doubt." *Id.* at 79–80 (quotation marks omitted).[18]

## 2. New Trial

As discussed above, Defendants argue that the government's use at trial of the "Member Towns" theory, on which Counts One and Four relied to charge thefts occurring during the 2016 calendar year, caused Defendants to suffer spillover prejudice on their conviction for Count Three, which charged thefts occurring during the 2015 calendar year. Prejudicial spillover occurs where "the

---

[18] We reject Defendants' attempt to subvert the bar posed by their conviction on Count Three to their challenge to the indictment. According to Defendants, the government's use of the "Member Towns" theory both was essential to securing an indictment that charged conduct occurring in 2016–17 and influenced the grand jury's decision to indict Defendants for their 2015 thefts in Count Three, which in turn permitted the government to create spillover prejudice before the petit jury on Count Three by introducing otherwise inadmissible evidence in support of the Counts based on that theory. That claim is necessarily premised on Defendants having suffered spillover prejudice before the petit jury, which we reject below.

jury, in considering one particular count or defendant, was affected by evidence that was relevant only to a different count or defendant." *Hamilton*, 334 F.3d at 182.

In assessing spillover prejudice, we look to three factors. First, we consider "whether the evidence introduced in connection with the dismissed count was so inflammatory that it would have tended to incite or arouse the jury into convicting the defendant on the remaining counts," *United States v. Henry*, 325 F.3d 93, 109 (2d Cir. 2003) (quotation marks omitted), a standard that is not met where that evidence was "no more inflammatory than the evidence . . . on the remaining counts," *United States v. Morales*, 185 F.3d 74, 83 (2d Cir. 1999). Second, we look to "whether the dismissed count and the remaining counts of the indictment arise from similar facts and whether the evidence introduced on the dismissed counts would have been admissible on the remaining counts." *Henry*, 325 F.3d at 109 (citation omitted). Third, we then "make[] a general assessment of the strength of the government's case on the remaining counts." *Id*. (quotation marks omitted). In short, we will grant a new trial only "in those cases in which evidence is introduced on the invalidated count that would otherwise be inadmissible on the remaining counts, *and* this evidence is presented in such a

manner that tends to indicate that the jury probably utilized this evidence in reaching a verdict on the remaining counts." *United States v. Rooney*, 37 F.3d 847, 855–56 (2d Cir. 1994); *see also Henry*, 325 F.3d at 110 (2d Cir. 2003) ("[T]here is no prejudicial spillover when the evidence would have been admissible on the remaining counts of the indictment."), citing *Rooney*, 37 F.3d at 855.

Our analysis of these factors leads us the same conclusion reached by the district court – that even assuming that the "Member Towns" theory was frivolous, no spillover prejudice resulted. As to the first factor, the evidence relating to Defendants' acts in 2016 and 2017 was no more inflammatory than the evidence bearing directly on Count Three. The evidence that Defendants planned and took trips to the Derby in 2016 and 2017 was "just more of the same" evidence offered to prove that the 2015 Derby trip was improper: "high-priced premium Derby tickets, a charter jet, extravagant expenses, and the inclusion of people with no business relationship with CMEEC." *Rankin*, 651 F. Supp. 3d at 558. We find it unlikely that the jury was inflamed to convict Defendants of theft in 2015 due to evidence that, in subsequent years, Defendants stole money from the same entity, to attend the same event, and to make the same purchases.

84

*Morales*, 185 F.3d at 83 (evidence was "no more inflammatory" where evidence to support vacated and surviving counts all "related to violent armed robberies.").

Although Defendants point to scattered pieces of evidence to claim that the evidence of the trips in 2016 and 2017 was more sensational than the evidence properly before jury as to the trips in 2015, we fail to see how that is the case. For example, Defendants cite the testimony of Rankin's assistant, Ellen Kachmar, who testified about the costs of the chartered jet ($42,355.28) and a group dinner at the Rivue restaurant ($3,730) that were charged to CMEEC during the 2016 Derby trip. But of course, the jury was informed that, during the 2015 Derby Trip, Defendants spent CMEEC Funds on an even more expensive chartered jet (in excess of $54,000) and a more expensive group dinner at that same restaurant ($10,827.51). Likewise, Defendants claim that they were prejudiced by the testimony of Amy Demicco and Donna Colonni, the spouse and the mother-in-law, respectively, of a CMEEC Board member, who attended the 2016 Derby trip even though that Board member himself did not attend. But their testimony was hardly more inflammatory than the evidence that Sullivan invited his bartender and her friend to the 2015 Derby, especially given that the bartender also testified

at trial and had an even more attenuated connection to CMEEC than did Demicco and Colonni.

The only evidence offered in support of the 2016–17 period distinguishable from that offered for the 2015 period was the evidence in support of the "Member Towns" theory itself – *i.e.*, that the money used to pay for trip expenses belonged to CMEEC's members and that the towns of Groton and Norwich received federal housing and snow removal benefits. But despite Defendants' strenuous efforts to show the contrary, that evidence was "dull and dry," *Rankin*, 651 F. Supp. 3d at 557, and is precisely the sort of evidence that we have found is not inflammatory or likely to have influenced the jury to convict. *See United States v. Wapnick*, 60 F.3d 948, 953 (2d Cir. 1995) (holding that evidence of structuring transactions to avoid currency transaction reporting requirements was not "of the sort to arouse a jury") (quotation marks omitted); *Henry*, 325 F.3d at 109 (2d Cir. 2003) (evidence that defendant conspired to launder monetary instruments and "clean up . . . drug money" was unlikely to influence the jury to convict on other counts) (quotation marks omitted).

Although Defendants claim that the government unfairly argued to the jury that Defendants' thefts harmed "ratepayers in the towns, people who live

and work there," Def. App'x 655, that statement was true, and could have been made regardless of the validity of the "Member Towns" theory. The trip expenses were paid using CMEEC's Margin, which CMEEC's Membership Agreement required to be distributed to the members in their rate stabilization funds, which those members would use to stabilize electricity rates for their customers. Nor do we think it likely that the jury improperly sought to punish Defendants based on the notion that the stolen funds belonged to the towns rather than to CMEEC – in either case, Defendants stole public money belonging to a public company operating for the public benefit, and that was true regardless of the validity of the government's technical argument that the towns were "members" of CMEEC who "owned" the money. Indeed, in the present case we have unusually strong evidence that the jury was not influenced by the "Member Towns" evidence, because the jury rejected the "Member Towns" theory to which that evidence was directed in a special interrogatory.

The second factor also favors the government. As discussed above, the evidence and factual circumstances regarding the 2015 Derby trips were highly similar to those regarding the 2016 and 2017 Derby trips, and "prejudicial spillover is unlikely if the dismissed count and the remaining counts were . . .

quite similar." *Hamilton*, 334 F.3d at 182. Furthermore, we agree with the district court that nearly all of the evidence relating to the 2016 and 2017 trips would have been independently admissible to prove Defendants' thefts in 2015, even if their conduct relating to the former trips had not been charged under other counts. *See Rankin*, 651 F. Supp. 3d at 556–59 ("[T]here is very little evidence from 2016 and 2017 that I would not have allowed in support of Count Three.").

Most notably, we fail to see how any evidence related to the 2016 Derby Trip was inadmissible in support of Count Three. Most of the payments for that trip were made during 2015 when, at Rankin's direction, CMEEC prepaid the cost of the ticket packages. Those ticket payments were therefore attributable to Count Three, as they were misapplications of CMEEC funds that occurred in 2015, *id.* at 556, and indeed, the district court instructed the jury to that effect *at Defendants' request*, *see* Gov. App'x 1089, 1118. Thus, evidence relating to the 2016 Derby Trip was substantively relevant to and admissible concerning Count Three. Among other issues, the jury was entitled to learn (1) whether the Board later authorized those payments and whether Defendants attempted to hide them from the Board, (2) how Defendants used the tickets purchased in 2015, (3) who attended the Derby using those tickets, and (4) whether the trip actually had

a legitimate business purpose. Defendants, despite knowing that twenty-one of the thirty-two guests at the 2015 Derby trip had no business affiliation with CMEEC, proceeded to purchase in 2015 even more tickets for the 2016 Derby, which was ultimately attended by *thirty-two* (out of forty-four) guests with no business affiliation to CMEEC. Thus, who attended and what occurred at the 2016 Derby trip were highly probative as to whether Defendants both intended to and did convert the 2015 prepayments, which purchased the tickets for the 2016 trip, to their personal use.[19]

Moreover, much of the remaining evidence as to the 2016 and 2017 period would have been, at minimum, admissible as other acts evidence under Fed. R. Evid. 404(b) to prove Defendants' wrongful intent. *United States v. Goffer*, 721 F.3d 113, 124 (2d Cir. 2013) ("Subsequent acts are frequently probative as to intent."). For example, Rankin's efforts to prevent the press from uncovering that many of the guests during the 2015 Derby trip and the October 2015 Greenbrier

---

[19] For example, Defendants complain that the government prejudicially cross-examined Rankin on whether he had conducted a "consensual intimate relationship" with a guest on the 2016 Derby trip, claiming that that line of inquiry was irrelevant. Def. Rep. Br. at 31 (quotation marks omitted). But of course, evidence that Rankin invited a romantic partner who lacked any affiliation to CMEEC other than her relationship with him is probative on the issue of whether Rankin converted the funds used to purchase the tickets to his personal use in an unauthorized manner.

trip lacked any affiliation to CMEEC demonstrate that he was well aware that the inclusion of such guests was improper. *See Rankin*, 651 F. Supp. 3d at 557.

Although Defendants object that such other act evidence would have been subject to a limiting instruction absent the government's use of the "Member Towns" theory, the absence of such an instruction does not demonstrate spillover prejudice here. Defendants' "core defense throughout the trial" was that they had made the trip expenditures in good faith, *Rankin*, 651 F. Supp. 3d at 537, and an instruction limiting the jury's consideration of 2016 and 2017 conduct to Defendants' motive, intent, or knowledge, *see* Fed. R. Evid. 404(b)(2), would have directed the jury to consider that evidence for that exact purpose – negating Defendants' claim of good faith. Moreover, we have repeatedly rejected claims of spillover prejudice based on evidence admitted without a limiting instruction as substantive proof of a vacated or misjoined count where that evidence "would, in the absence of [that] count, have been admissible under Fed. R. Evid 404(b)." *Hamilton*, 334 F.3d at 185 (evidence of other drug dealing incidents offered in support of another count was admissible under Rule 404(b) as to remaining counts and therefore did not create spillover prejudice).

Defendants are therefore wholly mistaken that evidence of events in 2016 and 2017 was inadmissible simply because it "colored the jury's view of the earlier" junkets. Def. Br. at 64. The evidence of those events was admissible for precisely that purpose.

As for the third factor, the government's evidence as to Count Three was strong, especially with respect to the August 2015 Greenbrier golf trip, which Defendants concede was never included in CMEEC's budget. *See Rankin*, 651 F. Supp. 3d at 559. Defendants resist that conclusion by pointing to their acquittals on other counts, but the spillover analysis looks to the strength of the "remaining counts" of conviction, *Hamilton*, 334 F.3d at 182, and it is well-settled that a defendant cannot attack his conviction because it was inconsistent with an acquittal on another count, *United States v. Powell*, 469 U.S. 57, 58 (1984). Indeed, the principle that a partial acquittal cannot undermine a conviction applies with even more force in the spillover context, as we have repeatedly held that such a verdict "indicates that the jury was able to distinguish between counts or between defendants, and to assess separately the evidence pertinent to each." *Hamilton*, 334 F.3d at 183 ("The absence of [prejudicial] spillover is most readily inferable where the jury has convicted a defendant on some counts but not on

others."); *United States v. Stewart*, 433 F.3d 273, 310 (2d Cir. 2006) ("It is clear from the partial verdict of acquittal that the jury carefully evaluated the evidence and rendered a discriminating verdict and not one that was based on uncharged acts or bad character.") (quotation marks and brackets omitted).

In conclusion, even if the "Member Towns" theory were frivolous, Defendants did not suffer spillover prejudice from its use at trial. That conclusion is bolstered by the district court's determination that much of the evidence brought using that theory was independently admissible in support of Defendants' convictions on Count Three, and that the remaining inadmissible evidence was unlikely to have inflamed the jury. *See United States v. Sam Goody, Inc.*, 675 F.2d 17, 26 n.9 (2d Cir. 1982) (recognizing that a "trial judge is better situated than" an appellate court to assess the "presence and effect" of factors leading to spillover prejudice), superseded by statute on other grounds as recognized in *United States v. Hundley*, 858 F.2d 58, 64 (2d Cir. 1988).

## III.   Authorization

In their third challenge to their convictions, Defendants again argue that their convictions should be vacated with instructions to dismiss the indictment based on the government's purported misconduct before the grand jury, this

time on the basis that the government "knowingly or recklessly misled the grand jury" as to whether CMEEC's board "budgeted or approved" the 2015 Derby, October 2015 Greenbrier, and 2016 Derby trips. Def. Br. at 66. To do so, Defendants cite various pieces of evidence possessed by the government at the time of the grand jury presentation which they assert prove that the Indictment falsely alleged that Defendants "did not seek the approval of the CMEEC Board of Directors for these trips and did not include the costs for the trips as budget expenses in the annual general administrative budgets . . . approved by the CMEEC Board of Directors." Def. App'x 41–42 (Indictment).

However, the evidence as to the Board's purported approval of the trips was presented at trial and argued before the jury, which returned a guilty verdict against Defendants on Count Three. *Lombardozzi*, 491 F.3d at 80 ("[A] guilty verdict at trial remedies any possible defects in the grand jury indictment.") (quotation marks omitted). At Defendants' request, the district court instructed the jury that the government bore the burden of proving, beyond a reasonable doubt, that Defendants lacked "a good faith belief that the expense[s] served a legitimate corporate purpose." Gov. App'x 1118.[20] Defendants were then

---

[20] Defendants did not object to the phrasing of that instruction before the district court, nor do they do so on appeal.

permitted to argue, without objection, that they believed the expenses were "legitimate" because they had been approved by the Board.

Notably, Defendants conspicuously fail to argue that the trial evidence was insufficient to permit the jury to conclude beyond a reasonable doubt that their thefts were unauthorized by the Board. Indeed, Defendants could not successfully make that challenge, because, as they concede, there was no evidence that the Board approved, budgeted, or even knew of the August 2015 golfing trip to the Greenbrier taken by Rankin, Sullivan, Bilda, and DeMuzzio, and there was sufficient evidence to convict Defendants on Count Three based on that trip alone.[21] *See Rankin*, 651 F. Supp. 3d at 548. Rather, they choose to reframe their authorization argument through the lens of a claim that the government misled the *grand jury* about the Board's purported authorization of the remaining three trips.

However, even if the August 2015 Greenbrier trip had never occurred or had never been charged in the Indictment, the evidence at trial amply supports the jury's apparent rejection of Defendants' authorization defense beyond a

---

[21] Unlike the 2015 Derby, October 2015 Greenbrier, and 2016 Derby trips, the August 2015 Greenbrier trip was not encompassed in a specific line item allocation created for the trips within CMEEC's annual budget.

reasonable doubt as to the other three trips attributable to Count Three.[22]

Accordingly, the government cannot be found to have misled the grand jury. *See*

*United States v. Mechanik*, 475 U.S. 66, 70 (1986) (A guilty verdict demonstrates

"not only that there was probable cause to believe that the defendants were

guilty as charged, but also that they are in fact guilty as charged beyond a

reasonable doubt."). At best, Defendants' claim boils down to speculation that

the government withheld exculpatory evidence before the Grand Jury that was

ultimately presented at trial. But even assuming that the government did so, the

Supreme Court has made clear that the government has no obligation to present

exculpatory evidence before the grand jury, "substantial" or otherwise, nor do

courts have "authority to prescribe such a duty." *United States v. Williams*, 504

U.S. 36, 53–55 (1992).

---

[22] We note that, in the ordinary course, a defendant cannot seek to vacate his conviction on the basis that there was insufficient evidence to support one or more alternative factual theories underlying that conviction, nor can he do so by reframing his insufficiency challenge as one directed to the indictment. It is well settled that "no new trial is required by factual insufficiencies in certain prosecution theories [where] the jury's general verdict of guilty was supported by sufficient proof on alternative theories." *United States v. Salmonese*, 352 F.3d 608, 625 (2d Cir. 2003); *see Griffin v. United States*, 502 U.S. 46, 56–59 (1991). We address the partial authorization defense here only because Defendants challenge the restitution amount on a near-identical basis. *See infra* Part IV.

**A. Whether an Agent Held a Good-Faith Belief that His Actions Were Authorized by the Principal Is a Matter of Fact for the Jury.**

As provided by 18 U.S.C. § 666(a)(1)(A), an agent of an organization may not "embezzle[], steal[], obtain[] by fraud, or otherwise without authority knowingly convert[] to the use of any person other than the rightful owner or intentionally misappl[y], property" belonging to that organization. As we have explained, "[t]he first four prohibitions cover any possible taking of money for one's own use or benefit," while the last prohibits "intentional misapplication for otherwise legitimate purposes." *United States v. Urlacher*, 979 F.2d 935, 938 (2d Cir. 1992). Because the district court instructed the jury that the first four prohibitions were the exclusive "ways" in which an intentional misappropriation may occur, Gov. App'x 1117, we limit our analysis below to those four prohibitions.

The evidence was more than sufficient for the jury to conclude that Defendants expended CMEEC's funds for their own benefit and that Defendants lacked a good-faith belief that the trips provided a legitimate benefit to CMEEC. We acknowledge, of course, that many corporations hold retreats containing substantial recreational activities, and we do not think Congress intended to make it a federal crime for a corporate officer to make a good-faith misjudgment

96

that such a retreat would provide some team-building or other benefit to the corporation when that benefit in fact turns out not to justify the cost.[23] However, the jury had a reasonable basis here to conclude that Defendants viewed the trips as personal vacations and that the corporate purposes they advanced to justify their conduct were mere window-dressing to disguise that personal purpose.

To start, the trips were wildly out of proportion with the rest of CMEEC's budget. In 2015, Defendants spent $502,242.18 on the four trips, a sum: larger than the entire amount budgeted for *all* "Office_Expenses" ($470,093); seven times that for "Staff Travel, Lodging & Miscellaneous" ($72,496); nearly twice that for the Board's compensation ($275,500); forty times that for "Company Celebrations & Events" ($12,500); and six-and-a-half times that for "Staff Training, Seminars & Conferences" ($77,000). Def. App'x 1545–47 (2015 A&G Budget details). Of course, "lavish-but-legitimate corporate retreats" are not criminal, *Rankin*, 651 F. Supp. 3d at 551, but the sheer scale of the trip costs in

---

[23] The jury was instructed to that effect. Gov. App'x 1118 ("Even if authorizing or incurring an expense was unwise and did not ultimately benefit CMEEC, a defendant [cannot be found guilty] . . . if he authorizes or incurs an expense because of a good faith mistake about whether the expense would serve [a] legitimate corporate purpose.").

97

relation to other budget items is powerful evidence that Defendants did not intend the junkets to be legitimate.

The purchases made by Defendants further demonstrate Defendants' lack of good faith. Among other items, Defendants spent $2,200 for women's scarves, thousands of dollars for separate Derby flights for Bilda's parents and Sullivan's brother, and $2,300 on a limousine to attend a private party hosted by Sullivan's friend. We fail to see how those expenses bore any relation to CMEEC's business, or how Defendants could have believed that they did. Defendants' treatment of those purchases as simply another trip expense demonstrates, in turn, that Defendants were well aware that the trips were not for the benefit of the company.

Most importantly, each of the three "board retreats" was attended by eight or fewer (including Defendants themselves) of CMEEC's nineteen Board members, and all of those attending members were representatives of three (of five) CMEEC members. By contrast, the majority of the attendees at all three trips, such as Sullivan's son, brother, sister-in-law, bartender, and the bartender's friend, and Bilda's parents, friend, and that friend's wife, had no relationship to CMEEC. *See Rankin*, 651 F. Supp. 3d at 534, 536 (noting that 21 of 32 guests to the

98

2015 Derby and 32 of 44 guests to the 2016 Derby were not CMEEC officers or employees). Defendants' diversion of CMEEC funds to pay for such guests is precisely a conversion "to the use of any person other than the rightful owner." 18 U.S.C. § 666(a)(1)(A). Nor was there any "evidence to suggest that the board was presented with and approved the inclusion and financing for [such] persons." *Rankin*, 651 F. Supp. 3d at 548.[24] A jury could readily infer that Defendants understood that the trips were not legitimate retreats in service of the company, as "team-building" or otherwise, based on the guest lists alone.[25]

Finally, the events during the trips belie any notion that Defendants could have believed in good faith that they served the company. Only one of the trips contained any work events, and even during that trip one of the two scheduled

---

[24] Although Rankin sent invitations to the Derby trips to all members of the Board, only the attendees received the guest lists, and therefore the Board members who did not attend the trips were largely unaware of who attended them.

[25] Although Defendants argue that many of the most egregiously unrelated guests, such as Sullivan's bartender, were last minute "seat filler[s]," Def. Rep. Br. at 31, that fact does not undermine their lack of good faith. Defendants still invited those guests rather than extending invitations to other CMEEC Board members or employees, demonstrating that they viewed the trips as personal vacations that did not benefit the company. *See United States v. Sampson*, 898 F.3d 270, 278 (2d Cir. 2018) ("[For] fiduciary embezzlement, the requisite [fraudulent] intent need not coincide with the accused's actual taking of the property.") (quotation marks omitted). Moreover, even though a large proportion of the 2015 Derby tickets went to guests lacking any relationship with CMEEC, Rankin immediately purchased even more tickets to the 2016 Derby, showing that he knew that many of those tickets would likewise go to unaffiliated guests.

work-related events was canceled in favor of a recreational tour of the facility, demonstrating that Defendants did not believe that the trip was a legitimate work event. Nor were there any events designed to enhance "team-building." As Rankin himself wrote in the Derby itineraries, guests would arrive at the Derby for a group dinner and then be left to "[a]fter dinner fun on your own," while on the following two days guests would "[e]at, drink, be merry, and watch races all day" with "[e]veryone on their own for the balance of evening." Def. App'x 1612–13. A reasonable jury could conclude that Defendants did not believe that the trips served a corporate purpose, given that the attendees were, with the exception of a single group dinner, largely left to their own devices.

Thus, the jury could reasonably have concluded that Defendants took the trips intending to gratify their personal desires and not to benefit the company, which would ordinarily be sufficient mens rea for theft or conversion. *See United States v. Sampson*, 898 F.3d 270, 277 n.5 (2d Cir. 2018) ("A conversion requires solely an intent to exercise a dominion or control over the goods, in a manner that is in fact inconsistent with [another's] rights.") (quotation marks omitted). However, § 666(a)(1)(A) requires the conversion to have been "knowing," and "[t]here can, of course, be no interference with the owner's rights to the property

100

if the owner has given permission to the act in question." *Bascuñán v. Elsaca*, 927 F.3d 108, 119 (2d Cir. 2019) (quotation marks omitted). We therefore agree with Defendants that the government was required to prove that "the defendant act[ed] . . . without a good-faith belief that [his appropriation of property] has been authorized." *United States v. Stockton*, 788 F.2d 210, 217 (4th Cir. 1986) (holding that good-faith belief that appropriation is authorized is a defense to 29 U.S.C. § 501(c), which makes it an offense for a union official to "embezzle[], steal[], or unlawfully and willfully abstract[] or convert[]" property belonging to his union).

As evidenced by the text of § 666(a)(1)(A), which refers to conversions "without authority" and requires the defendant to have been an "agent" of the victimized entity, we think it clear that Congress intended to incorporate, where appropriate, general principles of agency into the statute. Under those principles, an agent's authority is limited to acts which are "reasonable for him to infer that the principal desires him to do," *Restatement (Second) of Agency* § 33 (1958), as interpreted "in light of all accompanying circumstances," *id*. § 34.[26] We further

---

[26] "Such authority may be express or implied, but in either case it exists only where the agent may reasonably infer from the words or conduct of the principal that the principal has consented to the agent's performance of a particular act." *Minskoff v. Am. Exp. Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996). However, an agent's

emphasize that "the issue is not whether the Defendants were anywhere explicitly *prohibited*" from making the expenditure; "rather, the issue is whether they lacked the authority to do so." *United States v. García-Pastrana*, 584 F.3d 351, 375 (1st Cir. 2009); *see also United States v. Hammond*, 201 F.3d 346, 349 (5th Cir. 1999) (although union president did not "break any law or union rule" in spending political funds, a "rational juror" could conclude that an individual with the defendant's experience would have recognized that the expenditure was unauthorized).

Nonetheless, acceptance of those basic principles does not answer the underlying question – what constitutes *corporate* "authorization" of an act? "A corporation can only act through its directors and officers," *In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 160 (2d Cir. 2021), and therefore a corporation can manifest its desires only through the acts of its agents. Defendants' argument rests on the assumption that approval by CMEEC's Board is equivalent to authorization by CMEEC, but a corporate board's power to make decisions on behalf of the corporation is not unlimited, as directors owe fiduciary

---

authority is "entirely distinct" from apparent authority, as the latter concept refers to an agent's power to bind her principal to a transaction with third parties even where the agent lacks actual authority vis-à-vis her principal. *Id*. (quotation marks omitted).

102

duties to the corporation. *See* Conn. Gen. Stat. § 33-756(a) (board of directors must act "in good faith" and "in the best interests of the corporation."); *Joy v. North*, 692 F.2d 880, 886 (2d Cir. 1982) (noting that, as a general principle of corporate law, directors are liable "in cases, *e.g.*, in which the corporate decision lacks a business purpose, is tainted by a conflict of interest, is so egregious as to amount to a no-win decision, or results from an obvious and prolonged failure to exercise oversight or supervision") (citations omitted)

Accordingly, several of our sister circuits have concluded that even an explicit approval of a criminal misappropriation by an entity's board of directors is not an absolute defense to property embezzlement, theft, and conversion offenses, reasoning that such boards do not have the power to sanction a crime upon the corporation and thereby create a "license to steal." *See*, *e.g.*, *United States v. Unruh*, 855 F.2d 1363, 1368 (9th Cir. 1987) (analyzing 18 U.S.C. § 656, which prohibits misapplication of bank funds). According to those circuits, the board's "knowledge, ratification, and consent are not *per se* defenses," but rather are "evidentiary matters that may be considered as part of the defense" that the defendant lacked the requisite criminal intent. *Id.*, quoting *United States v. Cauble*, 706 F.2d 1322, 1353 (5th Cir. 1983); *see also United States v. De La Cruz*, 469 F.3d

103

1064, 1068 (7th Cir. 2006) ("[A] municipality's ratification, or authorization, of an expenditure is [not] a complete defense to . . . misapplication of public funds under 18 U.S.C. § 666(a)(1)(A)," and "so long as the proper intent exists, a . . . board's authorization does not bar criminal prosecution."); *United States v. Lore*, 430 F.3d 190, 202 (3d Cir. 2005) (holding that, for embezzlement or conversion of union funds under 29 U.S.C. § 501(c), "authorization and benefit [to the union] are merely factors that may be considered as bearing on intent," and therefore "it does not matter whether the union went through the form of authorization") (quotation marks omitted). Indeed, we ourselves have reached a similar conclusion as to mail fraud, and held that it does not "cleanse[] fraud if the fraudster manages to get a corporate endorsement" where the defendant "knew that his . . . practices . . . were fraudulent." *United States v. Moses*, 109 F. 4th 107, 116 (2d Cir. 2024) (holding that it was "irrelevant" that defendant believed his conduct was approved by corporation's executive director "in good faith because [defendant] was the mastermind behind the fraud scheme").

We need not go so far here.[27] The district court properly instructed the jury that the government bore the burden of proving that Defendants did not hold a

---

[27] Our own cases have, admittedly, muddied the waters on this question. *Compare United States v. Butler*, 954 F.2d 114, 118–19 (2d Cir. 1992) (holding that "a union official

good-faith belief that the expenses were "legitimate," Gov. App'x 1118, and Defendants both did not challenge that instruction and were permitted to argue that they held such a belief because the trips were approved by the Board. Whether a defendant held a good-faith belief that his or her "use of the funds was authorized or would be authorized" is a question of fact, *see United States v. Nolan*, 136 F.3d 265, 270 (2d Cir. 1998) (approving jury instruction to that effect); *see also United States v. McCarthy*, 271 F.3d 387, 396–97 (2d Cir. 2001) (same), and the jury evidently concluded that Defendants did not believe that CMEEC's Board approved their misappropriation. The evidence amply supported that verdict.

---

charged with embezzling union funds, pursuant to 29 U.S.C. § 501(c), lacks the requisite criminal intent when the evidence establishes that he had a good-faith belief *both* that the funds were expended for the union's benefit *and* that the expenditures were authorized," and therefore "authorization by the union . . . will not absolve a union official . . . where that individual, acting with the intent to deprive the union of its property, lacks a good-faith belief that the expenditure is for the benefit of the union") (emphases added); *United States v. McCarthy*, 271 F.3d 387, 396 (2d Cir. 2001) (approving disjunctive prongs of good faith as applied to embezzlement of funds from an employee benefit or pension plan under 18 U.S.C. § 664), *abrogated on other grounds by Eberhart v. United States*, 546 U.S. 12 (2005); *with United States v. Nolan*, 136 F.3d 265, 270 (2d Cir. 1998) (holding that government must prove that defendant lacked good-faith belief as to *both* authorization by pension plan's representatives and benefit to its participants).

**B.    The Evidence Was Sufficient to Permit the Jury to Find that CMEEC's Board Did Not Authorize the Trips.**

As numerous witnesses testified at trial, CMEEC's Board never voted to approve, or even discussed, the 2015 Derby trip, the October 2015 Greenbrier trip, or the 2016 Derby trip. Moreover, the Board was never informed about the details of the trips, such as the costs and the component expenses. Their testimony was supported by documentary evidence, as those trips never appeared in Board meeting minutes or votes. *See García-Pastrana*, 584 F.3d at 376 (holding that, although bylaws permitted board members to receive compensation, defendants could not claim that its provisions authorized their receipt of funds as compensation for their work as board members, as "there was no evidence, such as a formal resolution, meeting minutes, or any other documentation that showed that the [d]efendants exercised those provisions"). Indeed, Rankin himself acknowledged, in a 2016 email, that the Board never voted on the trips, instead arguing that such a vote or other Board action was not required to hold the trips.

**1.    Board Approval of the Budget**

In the face of that overwhelming proof as to a lack of Board approval, Defendants' blithely assert that the Board approved their junkets by approving a

budget containing a line item for retreats. However, the Board did no such thing

– it approved a "$350,000" line item for "expenses." Gov. App'x 2583. We find it

difficult to credit Defendants' contention that they sincerely believed that

permission to spend money on "expenses" authorized them to divert funds to

personal vacations to the Kentucky Derby and Greenbrier that provided no

benefit whatsoever to the corporation. Although such trips are, literally, an

"expense," Defendants' self-serving interpretation contains no limitation, as *any*

expenditure of CMEEC funds is an "expense." *See* EXPENSE, Black's Law

Dictionary (12th ed. 2024) ("An expenditure of money, time, labor, or resources to

accomplish a result."). Accepting Defendants' view, the "expenses" line item

authorized them to purchase private vacation homes, jewelry for their spouses,

or even illegal narcotics, so long as CMEEC paid for it. That result is plainly

inconsistent with the "broad substantive prohibitions" of § 666 and Congress's

"expansive, unambiguous intent to ensure the integrity of organizations

participating in federal assistance programs." *Fischer*, 529 U.S. at 678.

Defendants fail to cite a single case in support of their assumption that a

nondescript line item in a budget generally adopted by a corporate board

constitutes board approval of a misappropriation of funds for personal purposes.

Indeed, the vast weight of authority is to the contrary. As the Eleventh Circuit has succinctly described, "unauthorized personal expenditures do not become proper just because they are susceptible of classification within budgetary limits." *United States v. Tampas*, 493 F.3d 1291, 1299 (11th Cir. 2007) (holding that personal charges were improper even where they had been classified and approved under various categories of the organization's budget). Thus, the inclusion of a separate line item for "expenses" did not authorize Defendants' misappropriation of funds for the trips any more than had they simply charged the trips to a pre-existing line item, such as "Office Expenses" or "Misc. and General Expenses," Gov. App'x 2578 (2015 budget), as Defendants did with the August 2015 Greenbrier trip.

Defendants' claim that they believed in good faith that the budget authorized their misappropriation is further undercut by the evidence that, although Defendants intended from the start to spend the entirety of the "expenses" line item on the trips, they never informed the Board as to the significance of that line item. Several witnesses testified that neither the trips nor the expenses line item were discussed during the budget approval meeting or any other Board meeting, which was corroborated by the absence of any

references to "retreats," "Derby," "Greenbrier," or similar terms in the Board minutes. *See* Gov. App'x 132–33 (Board Member Yatcko); 170 (Kachmar, responsible for taking Board minutes); 608 (CMEEC General Counsel Sussler). Thus, Defendants not only hid from the Board that the $350,000 line item for expenses was *entirely* allocated to the trips, as opposed to some combination of the trips and other "expenses," but also hid that the trips were "expenses" and included in the budget *at all*. "An authorization obtained without disclosure of such material information is obviously a nullity." *United States v. Butler*, 954 F.2d 114, 119 (2d Cir. 1992), citing *United States v. Lavergne*, 805 F.2d 517, 523 (5th Cir. 1986). A jury could therefore easily discredit Defendants' claims that they believed the Board approved the trips given that Defendants left the Board to intuit that the trips were in the budget.

We reject Defendants' implication that their non-disclosure is irrelevant to whether they possessed a good-faith belief in the Board's approval simply because CMEEC's Bylaws, Membership Agreement, and policies did not contain a provision requiring that they disclose the trips or their costs to the Board. Even assuming that they had no duty to disclose, a tenuous premise given the

109

fiduciary duties that they owed to CMEEC as its officers and executives,[28]

Defendants misunderstand the nature of the good-faith element. The absence of an explicit company policy on point does not demonstrate that a defendant believed that the expenditures "were or would have been properly approved," *Butler*, 954 F.2d at 119, as that question, of course, turns on what the defendant believed the board understood itself to have authorized. When a defendant knows that the board is unaware of material information regarding his misappropriation, and thus knows that the board, in effect, approved a different transaction entirely, he cannot claim that he believed that the board authorized his conduct simply because *he* secretly understood the true nature of his misappropriation. *See Restatement (Second) of Torts* § 892B(2) (1979) ("If the person consenting to the conduct of another is induced to consent by a substantial mistake . . . and the mistake is known to the other . . . , the consent is not effective for the unexpected invasion or harm."). Accordingly, Defendants' undisclosed scheme to spend the "expenses" referenced in the budget on the trips does not demonstrate that they believed that the *Board* authorized them to do so. That is

---

[28] As we have recently explained, "a duty to disclose may arise from a fiduciary or similar relationship," such that a "failure to disclose material information constitute[s] fraud by omission." *Moses*, 109 F.4th at 114–15. Where such a duty to disclose exists, no "affirmative disclosure policy is required to prove fraud." *Id*. at 115.

true whether or not CMEEC's policies expressly required them to disclose the relevant facts.

A defendant remains free to argue to the jury that he believed that the board was aware of the undisclosed information or that it would have approved his conduct regardless, and Defendants did in fact make that argument, unsuccessfully, in this case. However, that argument is particularly strained on the record here. The Board was unaware that the budget contained funds that would be used for the trips (in other words, that the line item for "expenses" was for "retreats"); how much the budget allocated to the trips (that the entirety of the line item was allocated to the trips); or what was being purchased using those funds (that Defendants would invite dozens of guests without any business affiliation to CMEEC and purchase items with no relation to CMEEC's business). Thus, given that the evidence persuasively demonstrated that the Board was unaware of the basic fundamentals of the trips when approving the budget – what would be purchased, how much was being allocated, and even that the budget authorized an expenditure for the trips at all – the jury had ample evidence to support its conclusion that Defendants lacked a good-faith belief that the budget authorized their misappropriations.

111

### 2. Budgeting Process and Intent to Defraud in Obtaining Approval

Indeed, given that Defendants were responsible for the creation of budget materials and inserted the "expenses" line item within the budget, the jury could reasonably infer that Defendants not only knew that the budget did not authorize the trips, but also sought to mislead the Board to believe that the line item appropriation for "expenses" would be used for legitimate business expenses, when in fact that line item meant "junkets to the Kentucky Derby" for select executives and their friends. "Consent to possession of a chattel obtained by fraud . . . is not effective" as a defense to "trespass to the chattel or for conversion," *Restatement (Second) of Torts* § 252A (1965), and a defendant who fraudulently obtains corporate authorization obviously cannot claim a good-faith reliance on that authorization, *see Tampas*, 493 F.3d at 1299 (affirming § 666 conviction, because "[a] reasonable juror could have concluded that [defendant's] position of control over the [organization's] finances allowed him to disguise personal charges as business expenditures within the [organization's] budget"); *see also United States v. Tadios*, 650 F. App'x 394, 397 (9th Cir. 2016) (affirming § 666 conviction, despite defendant's argument that her use of entity's funds for personal travel was authorized, as the jury could find a lack of

112

authorization "[i]n light of the evidence that [defendant] misrepresented the purposes of her travel to her supervisors"). Defendants' misrepresentation of their thefts within the budget process amply demonstrates that Defendants acted with "intent to defraud" when obtaining the Board's approval, s*ee United States v. Rutigliano*, 887 F.3d 98, 109 (2d Cir. 2018) ("[T]he essence of fraud is misrepresentation, made with the intent to induce another person to take action without the relevant facts necessary to make an informed . . . decision.") (quotation marks omitted), which, although unnecessary to state a violation of § 666(a)(1)(A),[29] conclusively negates Defendants' purported belief that the Board approved the trips.

Although Defendants argue that certain materials presented to the Budget Committee made clearer references to the trips, consistent with their claim of good faith, the evidence regarding the earlier stages in the budgeting process was far more consistent with the government's theory of criminal intent. And even if the issue were closer, the question of which inference to draw was for the jury. "The possibility that inferences consistent with innocence as well as with

---

[29] *See Sampson*, 898 F.3d at 277 n.5 (2d Cir. 2018) ("[T]he 'intent' required for . . . an act to qualify as a 'conversion' is not the same as an 'intent to defraud.'"); *United States v. Karron*, 348 F. App'x 632, 633 (2d Cir. 2009) (holding that "intent to defraud" is not a necessary element of § 666).

guilt might be drawn . . . is of no matter to sufficiency analysis because it is the task of the jury, not the court, to choose among competing inferences." *United States v. MacPherson*, 424 F.3d 183, 190 (2d Cir. 2005) (quotation marks omitted).

As a preliminary matter, the jury was presented with strong evidence that Defendants disguised the trips and their costs even from the Budget Committee. At Rankin's direction, the reference to and line item for "board strategic retreat" was changed to "member delegation expenses and retreats," Gov. App'x 2570, thereby misleading the Budget Committee as to how much money had been allocated to the trips. Although Defendants intended to spend the entire $350,000 line item on board "retreats," the change implied that less than $350,000 was being allocated to the trips, as some unspecified portion of that sum would fund "member delegation expenses."

Nor were the trip expenses explained elsewhere in the materials presented to the Committee. The extensive "Budget Book" presented to the Committee contained "over 1,200 lines of budget detail" regarding various expenses, Gov. App'x 383–84, but contained no references to any of the trips or their component costs, *see id*. 393 (Budget Book lacked references to "Kentucky," "Derby," "Greenbrier," the ticket broker, or similar terms). Thus, the Budget Committee

114

was unable to view the details of what items had been or would be purchased under the "expenses and retreats" allocation.

Although a corporate budget need not identify every expense in an allocation, the jury had sufficient evidence to draw a reasonable inference that Defendants intentionally omitted material information as part of an effort to obscure the trips within the budget, rather than as an innocent and natural part of the budget process. For example, the 2014 budget had included the 2014 Derby costs as part of various "A&G expenses" line items, Def. App'x 1545–47, whereas the 2015 budget prepared by Defendants charged the trip costs to a negative "expenses" line item against Margin that was excluded from the budget's accounting of "A&G expenses," Gov. App'x 2583. As a result, various categories of A&G expenses to which the trips had been charged fell precipitously between the 2014 and 2015 budgets. Meanwhile, shortly after a meeting in which the Budget Committee was presented with materials setting forth a detailed allocation of A&G expenses for 2014 as compared to 2015, *see* Def. App'x 1539–48, Rankin suggested to Pryor that "we may want to reverse those expenses for [the 2014 Derby] from 2014 from A&G and deduct it from margin," Gov. App'x 2570. In short, Rankin suggested a retroactive alteration of the 2014 A&G budget that

115

would disguise discrepancies between funding levels in the 2014 and 2015 budgets caused by the reallocation of trip expenses.

Most importantly, references to the junkets grew increasingly vague – and ultimately disappeared – as the budget developed. As described above, the two references to the trip contained in the Committee budgets changed from "strategic retreats" to "member delegation expenses and retreats." However, even that oblique and misleading description of the trips had been scrubbed from the 2015 budget by the time that it reached the full Board. Both the budget presented to the Committee and that presented to the Board included an "Assumptions" slide containing near-identical language – except that the one sent to the Board omitted the line regarding the "[c]hanged convention for funding" the trips. *Compare* Def. App'x 1541 *with* Gov. App'x 2574. Likewise, the line item for the trips changed from "Member Delegation Expenses and Retreats" to simply "Expenses." *Compare* Def. App'x 1575, *with* Gov. App'x 2583. In light of witness testimony that the full Board's review of the budget was "high level" and less detailed than that of the Budget Committee, Def. App'x 266–67, the jury could reasonably have inferred that the removal of any description of the trips from the budget was by design, to capitalize on the lessened oversight exercised

116

by the Board, rather than a natural result of the budgeting process. A jury

therefore could have easily drawn the inference that Defendants intended to

defraud the Board and did not believe in good faith that the budget "approved"

their misappropriation. *See Sampson*, 898 F.3d at 277 n.5. ("An intent to defraud

. . . involves a specific intent to deceive or cheat.") (quotation marks omitted).

Thus, even if the Budget Committee was fully aware that the budget

allocated $350,000 to the trips, the jury was not required to accept that

Defendants held a good-faith belief that the trips were a permitted use of

CMEEC's funds. CMEEC's Bylaws and Membership Agreement made

abundantly clear that its budgets were approved by a vote of the Board – not the

Budget Committee. *See* Def. App'x 1426 (Bylaws, providing that CMEEC's CEO

shall "prepare[] . . . a general administrative budget for each year, in

coordination with the appropriate CMEEC Board . . . Committee, and *submit* the

same to the . . . CMEEC Board of Directors for *approval by the Board*") (emphases

added); *id*. 1383 (Membership Agreement, providing that "the Board shall vote in

accordance with . . . the Bylaws to approve a budget"). Defendants' repeated

argument that the $350,000 allocation to the Derby and Greenbrier trips was

"approv[ed] by the [Budget] Committee" and "unanimously ratified" by the

117

Board, Def. Rep. Br. at 35, therefore mischaracterizes the question at hand. The Committee had no authority to approve the trips or the budget, nor did the Board "ratif[y]" the Committee's approval – the Board approved the budget in the first instance. A defendant cannot claim authorization based on an "approval from a superior who, [defendant knows], in the first place was not authorized to give it." *Stockton*, 788 F.2d at 217 ("[C]onversion . . . must be without the permission of *the owner*, and contrary to the wishes of *the owner*. . . . An appropriation or expenditure of [an entity's] funds is therefore unauthorized if it is done without the permission of *the* [*entity*], even if it is approved by a superior . . . official.") (emphases in original).

Accordingly, Defendants cannot rely on the Committee's knowledge of and failure to object to the trip expenses to demonstrate their good-faith belief in corporate authorization; what matters is their belief in the *Board's* approval.[30]

---

[30] Although, in an appropriate case, a defendant may argue that he believed that a board committee or other superior official had authority to approve his action, Defendants lacked a factual basis to make that argument here. The language of the Bylaws and Membership Agreement was unambiguous that the Budget Committee lacked such authority, and the evidence clearly demonstrated that Defendants were familiar with their provisions. *See*, *e.g.*, Gov. App'x 3492 (Rankin, in response to a 2016 email inquiring into the trips, citing the Bylaws and Membership Agreement and attaching "relevant" provisions to defend the trips); Def. App'x 507 (Rankin, testifying that he was part of an effort in 2013 to revise CMEEC's Bylaws and Membership Agreement). Nor was there any evidence to demonstrate that Defendants sincerely believed that the Committee, rather than the Board, "approved" CMEEC's budgets.

That is not to say that the Committee's conduct is irrelevant – its members were also Board members who later voted to approve the budget. But those members were only a small fraction of the Board, and given the evidence that neither the trips nor the line item allocation were discussed with the full Board, the jury was entitled to draw the reasonable inference that Defendants were well aware that the majority of the Board did not understand the significance of the line item or otherwise approve the trips' inclusion in the budget.

### 3. Other Evidence

Defendants also cite statements made by Kenneth Sullivan, a CMEEC Board member at the time of the charged conduct, in an October 31, 2016 pre-indictment interview with the FBI. *See* Exhibit D, Memorandum in Support of Def. Rankin's Motion to Dismiss, *United States v. Rankin*, No. 3:18-cr-272 (D. Conn. May 17, 2019), ECF No. 87-4.[31] Kenneth Sullivan informed the agents that he "disputed some of the media reports that indicated the Kentucky Derby trips were not discussed during CMEEC [B]oard meetings" and stated that "the Board voted on the trips as an expenditure listed in their budget." *Id*. at 2. However,

---

[31] Despite sharing surnames, Kenneth Sullivan and Defendant James Sullivan have no familial relationship.

119

similar evidence was presented at trial,[32] and the jury nonetheless rejected Defendants' interpretation of events. As discussed above, other witnesses testified that the trip expenditures were not approved, budgeted, or discussed by the Board. Consistent with that testimony, the board minutes contained no reference to the trips, and Rankin himself wrote in an email that "there was not ever a Board action or vote required for the retreats, therefore no minutes, reflecting this type of event or other types of engagement." Gov. App'x 3475. Moreover, Kenneth Sullivan had obvious motives to distort his views of the trips, not only to protect CMEEC from the growing storm of controversy, but also to protect himself, given that he had attended the 2015 Derby and October 2015 Greenbrier trips, and was therefore himself a potential target of internal disciplinary action by CMEEC or the government's investigation.

By returning a conviction on Count Three, the jury evidently decided the contest between Kenneth Sullivan's representations and the government's evidence as to the Board's approval in favor of the government. And in

---

[32] Although Kenneth Sullivan's statements were not before the jury and he did not testify at trial, the jury considered similar evidence in the form of "talking points" provided by Kenneth Sullivan near the time of his interview with the FBI for Rankin's use in response to media inquiries. In those talking points, Kenneth Sullivan suggested Rankin state that the Board had "reviewed, discussed and approved" the trips. Def. App'x 1697.

120

presenting its case before the grand jury, the government, like the trial jury, was not required to blindly accept Kenneth Sullivan's views as true. Given the countervailing evidence, Defendants' argument boils down to the contention that the government purportedly failed to present exculpatory evidence to the grand jury, which it has no obligation to do. *See Williams*, 504 U.S. at 55.

C.     **Even If the Board Had Approved a Budget Line Item for Retreats, the Jury Could Have Reasonably Concluded that Defendants Were Aware that Their Conduct Fell Outside the Scope of that Authorization.**

Further sinking Defendants' claims, a jury could reasonably have found Defendants guilty even assuming that they believed in good faith that the Board had approved a budget allocation for retreats. Since there was no evidence that the Board reviewed or approved individual trips, Defendants must rely on their purported belief that the Board's approval of a line item for retreats was approval of Defendants' junkets as they unfolded in practice. *See Restatement (Second) of Agency* § 402 (1958) ("An agent is . . . liab[le] . . . for the value of a chattel . . . or money which he holds for the principal . . . if the agent . . . intentionally and substantially deviates from his authority."). However, Board authorization to spend a certain sum on corporate retreats would have been just that –

authorization for legitimate corporate retreats in service of the company – and not an authorization to spend that money however Defendants wished.

Defendants did not transparently account for the trip expenses, and left the Board unaware as to who was attending those trips (that 52% to 73% of guests on each trip did not hold positions with CMEEC), what was being purchased on those trips (that the expenses included thousands of dollars for items unrelated to CMEEC's business, such as women's scarves, limousines to private parties, and fast-access passes to the Derby), and the costs of those items. Moreover, the government presented evidence that Defendants intentionally kept those facts hidden from the Board and CMEEC's members. *See*, *e.g.*, Gov. App'x 425 (Mayor of Norwich, testifying that, when Bilda invited her to the 2016 Derby, he instructed her to "be cautious about who [she] spoke to about the trip"). Finally, Defendants spent a total of $502,242.18 in 2015 on the trips, $150,000 more than provided by the $350,000 "expenses" line item,[33] despite the Membership

---

[33] We note that there is some imprecision in this figure, as the district court included prepayments made in 2015 for the 2016 Derby as losses incurred in 2015, whereas CMEEC's budget treated prepayments as "booked" when the expense is "realized." Def. App'x 377. Thus, the 2016 Derby prepayments were charged in 2015 but allocated to the 2016 budget, whereas the 2015 Derby prepayments incurred in 2014 were charged to the 2015 budget. Regardless, even under a date-budgeted rather than a date-expended calculation, Defendants exceeded the approved budget by more than ten

Agreement's clear requirement that they obtain additional Board approval for expenditures that would "exceed the Approved Budget by more than ten percent." Def. App'x 1384. Defendants' blatant disregard for the approved limits on the "expense" line item itself demonstrates that they understood that their actions were unauthorized. *See Butler*, 954 F.2d at 119 (finding actions were not "properly approved" where defendant increased payments "from the Board 'authorized' amount of $50, first to $75, and later to $100 – all without Board approval").

Thus, even assuming that the Board had approved a line item for retreats, the jury could have reasonably concluded that Defendants understood that the trips exceeded the scope of that authorization. Moreover, the jury could reach that conclusion on a micro level – that particular expenses were unrelated to CMEEC's business and unauthorized – or a macro level – that the *entire* trip was unrelated to CMEEC's business and that the Board had not authorized personal vacations attended by family, friends, and most egregiously, the friend of Sullivan's bartender. There was no "evidence [at trial] to suggest that the board was presented with and approved the inclusion and financing for [such]

percent, as the combined cost of the 2015 Derby and October 2015 Greenbrier trips exceeded $400,000.

persons," *Rankin*, 651 F. Supp. 3d at 548, and the jury could easily discredit Defendants' claims that they believed that authorization to hold *board* retreats permitted them to host junkets primarily attended by guests with no business affiliation to CMEEC whatsoever. In other words, the jury was not required to take Defendants at their word and accept that their personal vacations were in fact "retreats" approved by the Board simply because Defendants referred to the trips as "retreats." *See Tampas*, 493 F.3d at 1299 ("[U]nauthorized personal expenditures do not become proper just because they are susceptible of classification within budgetary limits.").

## IV. Defendant's Restitution Challenge

Finally, Defendants challenge in part the district court's restitution order, which we review for abuse of discretion. *United States v. Zangari*, 677 F.3d 86, 91 (2d Cir. 2012). As relevant here, Defendants were ordered to pay a total of $748,800.63 to CMEEC, $480,794.79 of which represented the funds that CMEEC expended in 2015 for the 2015 Derby, October 2015 Greenbrier, and 2016 Derby trips.

Although Defendants concede that the MVRA applies to the case and that CMEEC is a victim entitled to restitution, Defendants argue that the district court erred in calculating the amount of restitution. Specifically, Defendants again

124

argue that the Board approved and budgeted the 2015 Derby, October 2015

Greenbrier, and 2016 Derby trips, and therefore claim that those expenses were

not losses to CMEEC "resulting" from Defendants' conduct.[34] *See* 18 U.S.C.

§ 3663A(b)(1); *Zangari*, 677 F.3d at 91 ("Restitution is authorized only for losses

that were directly caused by the conduct composing the offense of conviction

and only for the victim's actual loss.") (quotation marks omitted and alterations

adopted).

We disagree. As discussed above, Defendants' efforts to smuggle the costs

of the retreat into the budget, hide the expenses through vague accounting

entries, and mislead the Board demonstrate that the Board did not "approve" or

authorize their diversion of CMEEC funds to pay for personal vacations. The

government presented sufficient evidence for the jury to reach that conclusion

beyond a reasonable doubt. It necessarily follows that the district court did not

abuse its discretion in reaching that same conclusion under a preponderance

standard.[35] *See* 18 U.S.C. § 3664(e) ("Any dispute as to the proper amount . . . of

---

[34] Defendants concede that the expenses for the August 2015 Greenbrier trip were not contained in a line item in CMEEC's budget, and that the expenses for that trip were therefore properly included in the restitution amount. *See* Def. Br. at 81 n.17.

[35] In determining restitution, the district court explicitly adopted the loss amount it found for purposes of calculating the applicable Sentencing Guidelines. *Rankin II*, 2023 WL 7403638, at *4. Although the "amount-of-loss calculation for purposes of

restitution shall be resolved by the court by the preponderance of the evidence.") Accordingly, the district court did not err in finding that the entirety of the 2015 trip expenses was a loss of property resulting from Defendants' offense.

Defendants' remaining arguments fail to move the needle. True enough, several CMEEC board members attended the three trips and were presumably on notice that the trips were wildly extravagant, had no apparent business purpose, and included a host of guests who bore no relationship with CMEEC. However, the failure of those Board members to exercise proper diligence to uncover the trips' true nature and put an end to them (or present them to the full Board for approval), does not demonstrate that those Board members, let alone the majority of the Board, consented to Defendants' theft. Simply put, the "victim's negligence in permitting a crime to take place does not excuse the defendant

sentencing does not always equal such a calculation for restitution," as the Guidelines, unlike the MVRA, permit the court to consider "intended loss" in addition to actual loss, "the quantity and quality of evidence the district court may rely upon to determine the amount of loss is the same in both contexts." *United States v. Germosen*, 139 F.3d 120, 130 (2d Cir. 1998) (quotation marks omitted). Where, as here, the district court's Guidelines loss calculation was "supported by the evidence and was [limited to] actual losses to the victims," and thus was equivalent to the losses subject to restitution, a defendant's challenge to the restitution order "must fail." *Id*.

126

from culpability for [his] substantive offense." *United States v. Allen*, 201 F.3d 163, 167 (2d Cir. 2000).[36]

Indeed, even if certain Board members who attended the trips had tacitly understood that the trips were improper and chosen not to press the issue so that they could continue attending such trips, Defendants would not be absolved of their theft, nor would the causal connection between their theft and CMEEC's loss be broken. *See United States v. Lindsey*, 850 F.3d 1009, 1014 (9th Cir. 2017) ("Two wrongs do not make a right, and [a] lender['s] negligence, or even intentional disregard, cannot excuse another's criminal fraud."). CMEEC's budgets were approved by the full Board, not its individual members. Defendants cannot rely on authorization by individual board members who themselves lacked the power to authorize their misappropriation of funds. *See Stockton*, 788 F.2d at 217. The fact remains that Defendants paid for the trips by converting CMEEC funds to their own use without the Board authorization, all the while taking actions calculated to disguise that theft from the Board. That

---

[36] Contrary to Defendants' assertions, the district court was not required to subpoena further witnesses and hold a factual hearing. As we have explained, "[n]othing in the detailed provisions of the statute contemplates that a defendant guilty of criminal fraud can escape mandatory restitution by requiring district courts to conduct mini-trials on the possible contributory negligence of the very persons victimized by the defendant." *United States v. Zafar*, 291 F. App'x 425, 429 (2d Cir. 2008).

some Board members might have turned a blind eye and shared in the rewards of Defendants' misconduct does not mean that Defendants did not cause CMEEC's loss.

Nor does CMEEC's failure to recover trip expenses from attendees other than Defendants, such as Board members who attended the trips and continued to serve on CMEEC's Board after Defendants' conviction, justify a reduction of the award. The MVRA does not require victims to engage in self-help or mitigate their damages to receive restitution. *See United States v. Rice*, 38 F.3d 1536, 1542 (9th Cir. 1994) ("[W]hether or not [the victim] might have been able to mitigate its damages . . . affords the criminal perpetrator no excuse. A crime victim is not required to mitigate damages."). Although 18 U.S.C. § 3664(j)(2) requires courts to reduce a restitution order "by any amount later recovered as compensatory damages for the same loss by the victim," it does not require the victim to proactively seek that recovery.

Accordingly, we conclude that the district court did not clearly err in determining that the Board did not approve or budget the trips, and that the expenses for those trips resulted from Defendants' criminal conduct. *See United States v. Goodrich*, 12 F.4th 219, 227–28 (2d Cir. 2021) ("Where [a defendant]

challenges the district court's finding of facts, we review for clear error."). We therefore do not need to reach the district court's alternative conclusion that board approval would not have immunized Defendants from liability.

## V. CMEEC's Restitution Challenge

Ordinarily, having resolved all of Defendants' challenges and being presented with no cross-appeal by the government, our analysis would end here. However, those parties are not the only participants in the present appeal. CMEEC petitions for a writ of mandamus directing the district court to revise its restitution order. According to CMEEC, the district court erred in concluding that the attorneys' fees advanced by CMEEC to Defendants for their defense were unavailable as a "loss . . . of property" under 18 U.S.C. § 3663A(b)(1). In response, Defendants contend that, although CMEEC is a crime "victim," it lacks statutory authorization to seek mandamus under the CVRA because it failed to properly assert its rights before the district court, and therefore its petition should be dismissed. Defendants further argue that the district court did not err in denying restitution for their criminal defense fees. Meanwhile, the government agrees with Defendants' latter argument, but not the former.

129

**A. CMEEC Properly Asserted Its Rights Before the District Court, and Is a Party Authorized to Seek Mandamus Before This Court.**

Under the CVRA, a crime victim is entitled to certain rights, including the "right to . . . restitution," *see* 18 U.S.C. § 3771(a)(6), which the "crime victim or . . . the Government may assert . . . in the district court in which a defendant is being prosecuted for the crime," *id*. § 3771(d)(1), (3). Once those rights are asserted, the "district court shall take up and decide any motion asserting a victim's right," and "[i]f the district court denies the relief sought, the movant may petition the court of appeals for a writ of mandamus." *Id*. § 3771(d)(3).[37] Thus, the CVRA not only permits a victim to vindicate its entitlement to restitution under the MVRA, but is also "a crime victim's only recourse for challenging a restitution order." *Federal Insurance Co. v. United States*, 882 F.3d 348, 359 (2d Cir. 2018) (quotation marks omitted).[38]

---

[37] Congress exempted victims "using the CVRA's mandamus procedures to seek appellate review of . . . restitution [orders] from the limitations on reopening a sentence contained in § 3771(d)(5)." *Fed. Ins. Co. v. United States*, 882 F.3d 348, 365 (2d Cir. 2018). We therefore do not consider those provisions here.

[38] As we have previously explained, the CVRA's right to restitution is "purely procedural," and "does not expand any substantive rights to restitution provided by the MVRA or other statutes." *Id.* at 358. The CVRA merely provides the "procedural mechanism" to vindicate the MVRA's substantive rights. *Id*. at 357.

Defendants contend that CMEEC lacks statutory authorization to seek mandamus because CMEEC did not independently "assert [its] rights" before the district court, as required by the CVRA. 18 U.S.C. § 3771(d)(1). Defendants further contend that even if CMEEC independently asserted its rights as a victim, the CVRA only permits mandamus by a "movant," and therefore CMEEC's failure to file a document styled as a "motion" before the district court renders it ineligible to seek mandamus. We disagree on both counts.

Contrary to Defendants' characterization of CMEEC as a passive bystander during the restitution proceeding, CMEEC was an active participant on its own behalf. For example, CMEEC not only filed an affidavit and supporting exhibits in support of the government's memorandum seeking restitution on behalf of CMEEC, *see* Add. 155–65, but it also independently filed a supplemental memorandum of law, affidavit, and documentation in support of its claims, *see id*. 240–63 ("Memorandum of [CMEEC] in Support of Its Claim for Restitution"). Thus, it is beyond question that CMEEC "assert[ed its] rights," 18 U.S.C. § 3771(d)(1), to restitution under 18 U.S.C. § 3771(a)(6).

Nor do we accept Defendants' contention that CMEEC cannot pursue mandamus relief because it did not title its submissions to the district court as a

131

"motion." Although § 3771(d)(3) provides the court shall decide "any motion asserting a victim's right" and that a "movant" may petition for mandamus, the CVRA does not turn on a formalistic rule governed by the victim's choice of caption. Section 3771(d)(3) begins by stating that "[t]he [victim's] rights . . . shall be asserted in the district court in which a defendant is being prosecuted," whereupon the court shall "decide any motion asserting [those] right[s]." In other words, the victim's assertion of its right is a "motion," regardless of whether it is styled as a "memorandum," "petition," or "application." After all, a motion is simply "[a] written or oral application requesting a court to make a specified ruling or order." *Motion*, BLACK'S LAW DICTIONARY (12th ed. 2024); 56 *Am. Jur. 2d Motions, Rules, and Orders* § 1 (2020) ("The term 'motion' generally means an application made to a court or judge to obtain a rule or order directing some act to be done in the applicant's favor in a pending case.") (footnotes omitted). Here, CMEEC requested that the district court order restitution in its favor as to Defendants' attorneys' fees. That is a motion, and CMEEC is therefore a movant. *See United States v. Monzel*, 641 F.3d 528, 530 (D.C. Cir. 2011) (permitting mandamus where victim did not file a formal "motion" for

restitution and instead only "filed a victim impact statement seeking . . .

restitution").

Accordingly, we conclude that we may hear CMEEC's petition, and deny

Defendants' motion to dismiss.

**B.**      **The District Court Did Not Err in Declining to Order Restitution
to CMEEC for Defendants' Defense Fees.**

Restitution under the MVRA poses "two distinct questions: (1) does the

MVRA apply in the case at hand; and, if so, (2) what is compensable as

restitution?" *United States v. Avenatti*, 81 F.4th 171, 207 (2d Cir. 2023) (citation

omitted), *cert. denied*, --- S. Ct. ---, 2024 WL 2709455 (2024). The parties all agree

that the MVRA applies to Defendants' convictions and that CMEEC is a victim

that suffered a "pecuniary loss as a direct and proximate result" of Defendants'

offense. *Id*. at 208. Therefore all that must be determined here is whether the

defense fees were "compensable as restitution." *Id*. at 207. Our review of that

question is for abuse of discretion, but where the award rests on an error of law,

our review is *de novo*. *Id*. at 203.

The MVRA provides for four categories of compensable restitution, two of which are relevant here.[39] "[I]n any case" to which the MVRA applies, the court must order the defendant to "reimburse the victim for lost income and necessary . . . other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4). Under this Circuit's precedents, a victim's attorneys' fees are compensable as an "other expense[]" under § 3663A(b)(4), but only if those fees were "incur[red] to advance the [government's criminal] investigation or prosecution of the offense" and "'necessary to [the victim's] participation" in those or related proceedings. *Afriyie*, 27 F.4th at 173 (quotation marks omitted). The district court determined that the defense fees were not "necessary" for CMEEC's participation in the proceedings, nor did they "advance" the government's investigation and prosecution, and thus declined to award the defense fees under § 3663A(b)(4).

In its mandamus petition, CMEEC has abandoned its claim that the defense fees are available under § 3663A(b)(4), and instead relies on

---

[39] The two remaining categories of restitution apply "in the case of an offense resulting in bodily injury," a circumstance that is not present here. 18 U.S.C. §§ 3663A(b)(2)–(3).

§ 3663A(b)(1). Under that provision, if the district court determines that the defendant's "offense result[ed] in damage to or loss or destruction of property of a victim of the offense," then the court must order the defendant to "return the property" or "pay an amount equal to . . . the value of the property." 18 U.S.C. § 3663A(b)(1). The district court rejected that argument below, reasoning that the "loss of property" subject to restitution is limited to "the loss caused by the conduct underlying the offense of conviction," and that Defendants' misappropriation did not "cause[] CMEEC to pay for the [D]efendants' legal defense." *Rankin II*, 2023 WL 7403638, at *7 (quotation marks and emphasis omitted).

### 1. Applicable Law

Causation under the MVRA proceeds under a two-step analysis. Because "restitution is permitted only for an amount of loss caused by the specific conduct forming the basis for the offense of conviction," *United States v. Gushlak*, 728 F.3d 184, 195 n.7 (2d Cir. 2013) (quotation marks omitted), "[w]e must turn first to identifying the nature and scope of the 'offense' on which restitution is based." *Goodrich*, 12 F.4th at 228. Inherent in that analysis is that the court may not order restitution for "loss[es] caused by relevant conduct" under the

135

Guidelines, as opposed to "the specific conduct that is the basis of the offense of conviction." *United States v. Vilar*, 729 F.3d 62, 97 (2d Cir. 2013) (quotation marks omitted).

Once that question is decided, we must determine whether the conduct underlying that offense "directly and proximately" caused the claimed loss to the victim. *Goodrich*, 12 F.4th at 229. (quotation marks omitted). Thus, the criminal "conduct must have been a necessary factor in bringing about the [claimed] harm," that is, it must be a "cause in fact." *Id*. In addition, it must also be a proximate cause, a principle that requires the harm to have a "sufficiently close connection to the conduct, which we evaluate based on whether that harm was foreseeable to a defendant." *Id*. (quotation marks omitted).

### 2.    Causation

Applying that analysis here, we conclude that the district court did not abuse its discretion in finding a lack of causation on the record before it. Defendants' convictions were based on their theft of funds in 2015 to pay for their various junkets, as charged in Count Three. Although the conduct underlying Defendants' convictions is not limited to amounts expended in

136

2015,[40] "CMEEC decided on its own initiative to pay the defendants' legal fees in accordance with its bylaws" and a contract that it willingly executed. *Rankin II*, 2023 WL 7403638, at *7. Under those documents, CMEEC advanced the money voluntarily, and Defendants were lawfully entitled to it. Moreover, CMEEC's Bylaws contained a preexisting clause requiring CMEEC to indemnify its officers and directors that was adopted *before* Defendants stole money to pay for trips, and that clause obligated CMEEC to defend them regardless of whether they had in fact stolen the funds. *See United States v. Calderon* 944 F.3d 72, 97 (2d. Cir. 2019) (finding that restitution was inappropriate because the charged fraud occurred "*after* [the domestic banks] had *already* decided to offer loans to the relevant foreign banks," and therefore could not have "influenced" the banks' decision). Given that Defendants' conduct did not influence CMEEC's decision to advance defense fees, the *advanced* funds were not a "loss . . . of property" resulting from the offense. 18 U.S.C. § 3663A(b)(1).

Instead, what CMEEC seeks is repayment of the advanced fees, as Defendants promised to return their defense fees to CMEEC should they be

---

[40] It would, for example, include Defendants' conduct during the 2016 Derby, as whether the prepayments for that trip were unlawful turns, in part, on whether that trip was converted "to the use of any person other than [CMEEC]." 18 U.S.C. § 666(a)(1)(A).

"finally adjudged . . . to be liable for . . . misconduct." Add. 219 (CMEEC Bylaws); *see also id*. 148 (referring to advancement of fees contract, in which each Defendant affirmed that he "acted in good faith," and promised to repay the advanced fees should it be "ultimately determined . . . that they were not entitled to indemnification"). However, CMEEC's entitlement to repayment does not result from Defendants' offenses – their theft of money to pay for trips – but from an independent obligation arising under the terms of CMEEC's agreements with Defendants. To whatever extent Defendants made false representations in their contracts with CMEEC to secure such fees, that conduct was not within the scope of their convictions and is, at most, "relevant conduct" that cannot give rise to restitution. *Vilar*, 729 F.3d at 97 (quotation marks omitted). Whether CMEEC may collect, and how much it may collect, is controlled by the terms of the contracts and its Bylaws. Thus, we agree with the district court that CMEEC has failed to "adduce[] sufficient evidence that [Defendants'] offense[s] . . . had a sufficiently close connection to the losses sustained." *Goodrich*, 12 F.4th at 231 (quotation marks omitted).

We do not foreclose the availability of defense fees under the MVRA under any and all circumstances; all we decide here is that the district court did not err

in finding a lack of causation in the circumstances before it. As we have previously explained, attorneys' fees are recoverable "pecuniary losses at the core of the MVRA" where those expenses were "accrued in the course of [defendant's] actual . . . crimes against [the victim]." *Avenatti*, 81 F.4th at 211 (holding that attorneys' fees paid by company in preparation for meeting that was part of defendant's extortionate scheme against company was a pecuniary loss).[41] We can easily imagine circumstances where an advance of defense fees is sufficiently related to a defendant's criminal conduct such that they might be recoverable as a loss of property caused by that conduct.[42] But that is not the case here. CMEEC decided to advance the fees in a manner that was uninfluenced by Defendants' misappropriation of funds, betting that it was worthwhile to

---

[41] Although we did not explicitly hold in *Avenatti* that the fees at issue were compensable under § 3663A(b)(1), that conclusion necessarily follows from its holding that the fees did not fall within § 3663A(b)(4), nor were they "unrecoverable 'costs of a private investigation that the victim chooses on its own to conduct.'" 81 F.4th at 210, quoting *Lagos v. United States*, 584 U.S. 577, 585 (2018). Because §§ 3663A(b)(2) and (3) concern restitution for losses due to "bodily injury," and are therefore inapplicable to the fees at issue in *Avenatti*, by process of elimination those fees must have been recoverable under § 3663A(b)(1).

[42] For example, we agree with the district court that such fees might be available where the offense conduct involved a "fraudulent[] induc[ement] . . . to pay . . . legal defense fees." *Rankin II*, 2023 WL 7403638, at *7. They might also be available where a defendant obtained his position with the victim company, and thus coverage under its indemnification provisions, due to the offense conduct. We express no view on the proper resolution of such issues; we note only that our holding in this case does not dictate a result in those situations.

indemnify its officers and later seek reimbursement from them should they be found guilty. It must live with that decision. *See Calderon*, 944 F.3d at 97 ("[I]f a person gives the defendant his money to bet, knowing that the bet might lose, his later loss, for purposes of restitution, is . . . caused not by the defendant accepting his money but by the outcome of the bet.") (quotation marks omitted).

## CONCLUSION

As set forth above, we see no reversible error in the district court's handling of the present case. We therefore AFFIRM the judgment of the district court, and DENY CMEEC's petition for mandamus.